# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-DP-00241-SCT

*RODNEY GRAY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/25/96 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | THOMAS D. LEE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| DISTRICT ATTORNEY: | J. KENNEDY TURNER |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - (DIRECT APPEAL) |
| DISPOSITION: | AFFIRMED - 8/6/98 |
| MOTION FOR REHEARING FILED: | 8/24/98 |
| MANDATE ISSUED: | 10/15/98 |

**EN BANC.**

**ROBERTS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. This appeal comes before this Court from the Circuit Court of Newton County, Mississippi. Rodney Gray was indicted during the July-August 1995 term of the Circuit Court of Newton County, for the capital murder of Grace Blackwell on August 15, 1994, while engaged in the commission of the crime of kidnapping and/or rape in violation of Miss. Code Ann. § 97-3-19(2)(e). On January 22, 1996, a jury was impaneled and found Gray guilty on January 24, 1996. Afterward, the jury heard evidence in support of aggravating and mitigating circumstances to determine the sentence to be imposed. The jury sentenced Gray to death on January 25, 1996.

¶2. The sentence of death was in the following form pursuant to Miss. Code Ann. § 99-19-101(5) and (7) (1994):

> (1) We, the Jury, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:

That the Defendant actually killed Grace Blackwell.

That the Defendant attempted to kill Grace Blackwell.

That the Defendant intended that the killing of Grace Blackwell take place.

That the Defendant contemplated that lethal force would be employed.

We, the Jury, unanimously find that the aggravating circumstances of; 1. The capital offense was committed while the Defendant was engaged in the commission of kidnapping.

2. The Capital offense was committed while the Defendant was engaged in the commission of or an attempt to commit the crime of rape; are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we further find unanimously that the Defendant should suffer death.

/s/ Allen B. Perry

Foreman of the Jury

¶3. Gray was sentenced to death by lethal injection by the lower court at a date to be fixed by appropriate order of an appropriate court. Gray's Motion for New Trial was overruled on February 20, 1996. Gray awaits the outcome of this appeal while incarcerated in the Maximum Security Unit of the State Penitentiary at Parchman, Mississippi. Gray has raised the following issues:

**I. WHETHER THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 3, SECTION 26 OF THE MISSISSIPPI CONSTITUTION OF 1890.**

**II. WHETHER THE COURT ERRED BY ADMITTING HEARSAY EVIDENCE.**

**III. WHETHER THE COURT ERRED IN RULING ON THE DEFENDANT'S MOTION TO PROHIBIT PROSECUTORIAL MISCONDUCT PRIOR TO TRIAL.**

**IV. WHETHER COMMENTS MADE BY PROSECUTOR DURING CLOSING ARGUMENTS VIOLATED THE DEFENDANT'S RIGHTS TO A FAIR AND IMPARTIAL TRIAL.**

**V. WHETHER THE COURT ERRED BY ALLOWING THE STATE'S DNA EXPERT TO TESTIFY ABOUT TEST RESULTS SHE DID NOT PERSONALLY CONDUCT.**

**VI. WHETHER THE COURT ERRED BY ALLOWING THE STATE TO INTRODUCE INTO EVIDENCE THE GRUESOME PHOTOGRAPHS AND VIDEO TAPE OF THE BODY OF THE VICTIM.**

**VII. WHETHER THE COURT ERRED BY ADMITTING A PHOTOGRAPH OF THE VICTIM INTO EVIDENCE BY A WITNESS WHO WAS NOT AT THE CRIME SCENE.**

**VIII. WHETHER THE COURT ERRED BY ALLOWING AN INSTRUCTION TO THE JURY AS TO RAPE, WHEN THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT SUCH AN INSTRUCTION.**

**IX. WHETHER THE JURY VERDICT EVIDENCED BIAS AND PASSION BECAUSE OF THE TIME OF DELIBERATIONS.**

**X. WHETHER THE COURT ERRED BY FAILING TO GRANT DEFENDANT'S MOTION FOR CHANGE OF VENUE.**

**XI. WHETHER THE COURT ERRED BY ALLOWING AN IN-COURT IDENTIFICATION OF THE DEFENDANT BY A WITNESS.**

**XII. WHETHER THE COURT ERRED BY FAILING TO DISMISS THE INDICTMENT BECAUSE THE UNDERLYING FELONIES WERE LISTED IN THE DISJUNCTIVE.**

**XIII. WHETHER THE COURT ERRED BY ALLOWING THE JAIL-HOUSE CONFESSIONS OF THE DEFENDANT TO HIS FORMER CELL-MATES INTO EVIDENCE.**

**XIV. WHETHER THE DEFENDANT WAS DENIED HIS RIGHT TO COUNSEL.**

**XV. WHETHER THE EVIDENCE IS SUFFICIENT TO SUPPORT THE SENTENCE.**

**XVI. WHETHER THE COURT ERRED BY GRANTING S-3 OF THE GUILT PHASE OF THE TRIAL.**

**XVII. WHETHER THE COURT ERRED BY GRANTING S-4 ON CIRCUMSTANTIAL EVIDENCE AT THE GUILT PHASE OF THE TRIAL.**

**XVIII. WHETHER THE EVIDENCE SUPPORTED A KIDNAPPING INSTRUCTION AT GUILT PHASE OF THE TRIAL.**

**XIX. WHETHER THE VERDICT IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

¶4. After reviewing the record, briefs, and prior holdings of this Court, we hold that there is no reversible error in this case. Therefore, Rodney Gray's conviction for capital murder and the imposition of the death sentence is affirmed.

## STATEMENT OF THE FACTS

¶5. Early in the afternoon on August 15, 1994, at approximately 1:40 p.m., the body of seventy-nine year old Mrs. Grace Blackwell was found at the end of a bridge in Newton County. Investigators found broken glass, several blood stains, and tissue on the bridge. Mrs. Blackwell's billfold, checkbook, and contents of her purse were found near the bridge. Investigators also found a plastic wadding from a shotgun shell.

¶6. Mrs. Blackwell's car was found later behind a service station in Decatur. Large amounts of blood were found all over the passenger side of the car, both inside and outside. A pair of gloves was located in a dumpster near the car. The car had been damaged on the front of the passenger side. There was blood and tissue on the front, across the hood, windshield, and down the passenger side of the vehicle. The interior of the car contained a great deal of blood and glass particles on the door paneling and seat.

¶7. Mrs. Blackwell's body received several extensive injuries. She had lacerations on her leg and facial area, severe wounds to her mouth and back side of her head, along with a gash to the back of her head. The lethal injury was a contact shotgun wound to the mouth. She also sustained a second gunshot wound to the left side of her face, as well as her chest and left arm. There were multiple small entrance wounds indicating secondary missile pattern injury, as if the shotgun had been fired through an intermediate target. This was a non-lethal wound. Mrs. Blackwell also received multiple injuries on her right side, where there were large scrapes of skin as if she slid on a hard object. She had bruises over her chest wall and right lower leg. There was also an abrasion or scrape of one inch to the labia majora or vaginal vault, which indicated forceful sexual penetration. The large cuts on Mrs. Blackwell had little blood, indicating they occurred after the shotgun wound to the face. Such injuries were consistent with being struck by a car or having fallen or been pushed from a car. Mrs. Blackwell's death was caused from extensive bleeding from the gunshot wound to the mouth. It would have taken a period of time to die, as the bleeding was from secondary vessels, and not every individual is immediately incapacitated from such a wound, as per the medical examiner's testimony. A rape kit was taken from Mrs. Blackwell, and the kit, as well as her clothes, were sent to the crime lab.

¶8. On the morning of August 15, 1994, Mrs. Blackwell went to her local bank in Louin, Jasper County, to use the drive-through window. Arlene McCree, the bank teller who usually waited on Mrs. Blackwell, testified that Mrs. Blackwell was acting strangely. Mrs. Blackwell presented a blank check for the teller to fill out in the amount of $1200. McCree stated that she could not see into the backseat of Mrs. Blackwell's car because there were clothes hanging on hangers blocking her view. After McCree filled out the check, Mrs. Blackwell snatched it back, signed it, and threw it back to the teller. When the teller gave her the money, Mrs. Blackwell grabbed it and drove away. As she drove off, McCree heard Mrs. Blackwell say over the speaker, "I'm hurrying, I'm hurrying." McCree then contacted the Jasper County Sheriff's office and asked them to check on Mrs. Blackwell as she thought she had been taken hostage.

¶9. Investigators in the Jasper County Sheriff's office went to Mrs. Blackwell's house and discovered the front door was open and the telephone had been disconnected. Shoe prints were found in the front yard, and a plaster cast was made and sent to the crime lab. The investigators began to look for Rodney Gray for questioning in Mrs. Blackwell's murder. Gray turned himself into authorities. When Gray was arrested on August 15, 1994, his clothes were taken and sent to the crime lab, and he was given a jail uniform to wear. Blood and hair samples were also taken from Gray and sent to the crime lab.

¶10. Mildred Curry, who was Gray's girlfriend at the time of the murder, gave investigators information that caused them to search her house trailer. Gray called Mildred from jail and told her that he had put some money away in a bathroom vent. She thought Gray was lying. However, during

the investigators' search of Curry's trailer, $1,123 was found hidden in an air conditioner duct in a bathroom. Mildred Curry later identified the shirt and work boots Gray was wearing on the day of the murder. The shirt and work boots were found in a five gallon bucket in a wooded area by a dog pen behind the trailer. Both items were sent to the crime lab.

¶11. Mildred's brother, Randy, lived in the trailer with her. He testified that Gray came home on the afternoon of August 15th wearing the striped shirt. When Randy told him that the police wanted to talk to him, Gray went to a bedroom, changed shirts, and then called the police.

¶12. Harry Jones testified that he was driving around noon on August 15th, when he saw a brown Chrysler stopped in the road with a guy wrestling with a lady in the car. He identified the car that he saw as the one belonging to Mrs. Blackwell. Jones could not tell if the woman was black or white, but clearly saw the young, black male driving. The State asked Jones if he could identify the driver of the car. Gray's attorneys objected stating the identification was a product of an impermissible lineup. The lower court overruled the objection and allowed the identification in the courtroom to proceed. Jones identified Rodney Gray as the driver of the car.

¶13. Richard Weir testified that during his lunch break on August 15, 1994, he saw a maroon colored Chrysler pass by his truck. He stated what caught his eye was that it was a black male and a white female in the car. Weir also testified that it looked like the male was trying to grab the female. Although Weir identified the car as Mrs. Blackwell's, he could not identify the occupants.

¶14. Derrick Beasley stated that Gray approached him on the afternoon of August 15th near the courthouse in Decatur. Beasley testified that Gray had a wad of money in his pocket that he pulled out and showed to Beasley. It was in denominations of one hundred dollar bills. Beasley also stated that Gray was wearing the striped shirt that the investigators later recovered from behind Curry's trailer.

¶15. Russell Saunders was incarcerated with Gray in the Jasper County jail in August and September of 1994. Saunders testified that after returning from giving the police blood samples Gray asked "if they could tell if you had sex with a woman." Saunders stated that Gray had told him that he had sex with the lady that he was supposed to have killed. Gray told Saunders that he had accidentally shot her and then ran over her. Gray stated to Saunders that he was not worried about the police finding the gun because he had smashed the gun and thrown it into the woods. Saunders had also heard Gray talking about the money that was supposed to be in a vent. In October or November of 1995, Gray was in the Newton County jail and told Cleveland McCall that he took Mrs. Blackwell to the bank to get some money. McCall testified that Gray told him that he brought her back from the bank, raped her and shot her with a .410 shotgun.

¶16. Several expert witnesses testified at the trial. Lora Aria, an expert in serology, stated that she identified four stains that could have been blood on the shirt Gray was wearing the day of the murder. She tested the stains and determined that two were human blood. Glass fragments recovered from the shirt found by the dog pen were optically indistinguishable from the glass from Mrs. Blackwell's car. There were blood stains found on the gloves recovered from the dumpster. The gloves also contained glass fragments which were optically indistinguishable from the glass from Mrs. Blackwell's car. The shirt worn by Gray at the time of his arrest also contained glass fragments that were optically indistinguishable from the glass from Mrs. Blackwell's car.

¶17. David Wilson was a Special Agent to the Federal Bureau of Investigation assigned to the Hairs and Fibers unit. He testified that he examined hair found in Mrs. Blackwell's panties with hair samples of Gray. His opinion was that the pubic hair found in the panties had the same microscopic characteristics as Gray's pubic hairs.

¶18. Gary Kanaskie was employed by the FBI to conduct shoe print and tire tread examinations. He compared the boots of Gray to the boot prints found at the home of Mrs. Blackwell. Kanaskie testified that the prints made at Mrs. Blackwell's home were made by the boots worn by Gray. Because there were three distinctive markings on the boots, Kanaskie testified that no other boot could have made the prints found at Mrs. Blackwell's home.

¶19. Finally, Melissa Smrz was assigned to the DNA analysis unit of the FBI. She conducted DNA tests on semen stains found on Mrs. Blackwell's panties. She testified that DNA was extracted from the semen and compared with blood samples from Gray. As a result of these tests, Smrz concluded that the probability that someone other than Gray left DNA in Mrs. Blackwell's panties was less than 1 in 446,000,000 in Black, Caucasian, and Hispanic populations.

¶20. After closing arguments, the jury retired at 3:11 p.m. to determine the verdict of guilt or innocence of Rodney Gray. The jury returned at 3:21 p.m. ready to report its verdict. The jury unanimously found Rodney guilty of the capital murder of Mrs. Grace Blackwell.

¶21. The jury then heard evidence as to mitigating and aggravating circumstances to consider when determining which sentence should be imposed on Gray. After hearing testimony from several witnesses from the State and the defense, the jury received its instructions from the court. Both sides then gave closing arguments. The jury began deliberations at 12:07 p.m. to determine the appropriate sentence. At 1:09 p.m. the jury returned to the courtroom ready to announce its decision. The jury reached an unanimous verdict finding that Rodney Gray should suffer death for the capital murder of Mrs. Grace Blackwell.

¶22. The normal post-trial motions were filed, heard on argument, and subsequently overruled by the lower court. Following this ruling by the lower court, Gray perfected his appeal to this Court.

**DISCUSSION OF THE ISSUES**

**I. WHETHER THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 3, SECTION 26 OF THE MISSISSIPPI CONSTITUTION OF 1890.**

¶23. Gray alleges a constitutional violation of his right to a speedy trial. On October 10, 1995, Gray filed a motion to quash the indictment claiming he had been denied a speedy trial. A hearing was had on this motion on October 30, 1995. After hearing argument from both sides, the lower court overruled Gray's motion to quash the indictment.

> BY THE COURT: The Defendant has filed his motion to dismiss the indictment, the Defendant having been indicted for the crime of murder while engaged in the commission of the crime of

kidnapping and/or rape. This indictment was returned on the 2nd day of August of 1995.

In doing so, he has brought into play *Barker v. Wingo*, which requires the Court to look at the evidence and make a finding regarding the delay, and to apply the analysis of the four prong test.

The Defense argues that the Defendant is prejudiced because of a length of delay occurring since the arrest on August the 15th of 1994, and says that by reason of the delay, he was prejudiced, in that since then he has been convicted of another crime, thereby restricting his right to give testimony in his own defense, and also because a possible witness has died in the intervening time.

The Court, in reviewing the evidence, finds that there was a delay of 257 days, being that time from the date of the charge on March 15th, 1995, until the date of the trial, which is now set for trial November the 27th, 1995, being a period shortly in excess of eight months, requiring the Court then, after determining there was a length of delay, to apply the test and determine the reason for that delay.

It appearing from the evidence that during this period of time, the serology materials were turned over to the Federal Bureau of Investigation for analysis, and that immediately upon receipt of a partial report, the Sheriff of this county filed charges.

The delay of discovery being negligent does not appear to be prejudicial and does not weigh heavily against the State, although the Court must find that it does weigh against the State.

The second test of whether or not the Defendant asserted his right to trial weighs against the Defendant, for the record appears that he did not assert that he was entitled to the right to be tried on the crime for which he was charged.

Before I get away from it, I want to say the DNA analysis being conducted by the Bureau could have been exculpatory and beneficial to the Defendant. Therefore, that weighs against the Defendant and whether or not he was prejudiced by the delay.

Contrary to the argument of the Defendant, the crimes for which this Defendant was convicted in the intervening time were crimes that he had committed prior to the burglary, kidnapping, and/or rape and murder of the lady on August 15th, 1994, so I fail to see how he can contend that the delay in his trial caused him to be convicted of a crime for which he had committed prior to the date alleged in this particular instance.

It is not clear, and it was not made clear, and the question was asked of the witness, what was the testimony of the person deceased, and there was no response to that question. Therefore, it has not been made clear to the Court what that witness would have testified to. Therefore, the Court would not be in a position of ruling whether or not the delay was prejudicial to the Defendant.

Considering, therefore, the prejudice by delay weighs against the Defendant, and application of the test of the *Barker v. Wingo*, I find that it weighs against the Defendant.

Therefore, the motion is overruled.

¶24. "This Court has held that post-delay determinations of cause are permissible and, when supported by substantial credible evidence, shall not be overturned." *Hull v. State*, 687 So. 2d 708, 729 (Miss. 1996) (citing *McNeal v. State*, 617 So. 2d 999, 1007 (Miss. 1993)). Likewise, we hold that the lower court was correct in overruling Gray's motion to quash the indictment.

¶25. The murder of Mrs. Blackwell took place on August 15, 1994. Rodney Gray was arrested that same day and charged with burglary of Mrs. Blackwell's residence based on statements he made to the police. He was incarcerated in Jasper County. Bond was set for that charge, but Gray never made bond. Gray was transported to Newton County and charged with the capital murder on March 15, 1995. Gray was arrested in Newton County for capital murder 212 days after his arrest for burglary in Jasper County. All the while, he remained in custody.

¶26. Counsel was appointed on March 22, 1995. Gray's preliminary hearing was had on June 5, 1995. He was indicted by the Grand Jury of Newton County on August 2, 1995. The lower court set the trial date for November 27, 1995. This date would have been 469 days subsequent to his initial arrest for burglary in Jasper County and 257 days from his arrest for capital murder in Newton County.

¶27. On November 17, 1995, the attorneys for Gray filed a motion for continuance. The lower court granted the motion and scheduled the trial to take place on January 22, 1996. At the time Gray filed his motion for continuance 459 days had passed since his initial arrest for burglary and 247 had passed since his arrest for capital murder. When his trial began on January 22, 1996, it had been 525 days since he was arrested for burglary and 313 days since his arrest for the capital murder of Mrs. Blackwell.

¶28. The State argues that at the time of Gray's initial arrest it could not be determined if Mrs. Blackwell had been raped. At the time of his arrest, Gary was also facing prior burglary charges in Jasper County. On September 6, 1995, Gray pled guilty to two burglaries and one attempted burglary. These crimes occurred prior to Mrs. Blackwell's murder. The State contends that until the FBI reports were received it was not clear whether Gray could be charged with capital murder with the underlying felony of rape.

¶29. Gray argues on appeal that his constitutional right to speedy trial attached August 15, 1994, the day he was arrested for burglary. The State claims Gray's constitutional right to a speedy trial attached on March 15, 1995, the day he was formally charged with capital murder.

¶30. The constitutional right to speedy trial attaches at the time when the defendant is first effectively accused of the offense. *Perry v. State*, 419 So. 2d 194, 198 (Miss. 1982). This Court has held this to begin at "'time of a formal indictment or information or else the actual restraints imposed by arrest and holding to a criminal charge.'" *Perry v. State*, 637 So. 2d 871, 874 (Miss. 1994) (quoting *Lightsey v. State*, 493 So. 2d 375, 378 (Miss. 1986)). The Court finds that Gray was effectively accused of the crime on March 15, 1995, when he was formally arrested and charged with the capital murder of Mrs. Blackwell. However, measuring the shortest possible time frame, 247 days (period of time Gray arrested for capital murder until Gray filed his motion for continuance) are attributable to the State. This is presumptively prejudicial because it is over eight months, and the State must show Gray has not been denied his right to a speedy trial. *Smith v. State*, 550 So. 2d 406, 408 (Miss.

1989); ***Rhymes v. State***, 638 So. 2d 1270, 1272 (Miss. 1994); ***Hull v. State***, 687 So. 2d 708, 730 (Miss. 1996).

¶31. Inquiry must be made into the other ***Barker v. Wingo***, 407 U.S. 514 (1972), factors:

> (2) Reason for delay;

> (3) Assertion of speedy trial; and

> (4) Prejudice.

None of the factors are dispositive, but are to be considered together. ***Wiley v. State***, 582 So. 2d 1008, 1011 (Miss. 1991); ***Barker***, 407 U.S. at 530-33.

> (2)**Reason for delay**--

¶32. The State asserts that the record does not indicate the delay preceding Gray's trial was a part of "[a] deliberate attempt to delay the trial in order to hamper the defense. . ." ***Barker***, 407 U.S. at 531. Any delay is excusable if it is attributable to the defense. ***Smith v. State***, 489 So. 2d 1389, 1391 (Miss. 1986). The record clearly shows that any delay after November 17, 1995, is attributable to the defense.

¶33. Gray claims the only reason for delay given by the State was the fact that it was waiting on DNA test from the FBI laboratory. The FBI received the evidence on September 9, 1994, and the results of the testing were faxed to the Newton County Sheriff's Office on March 14, 1995. Gray was charged with capital murder after the Newton County Sheriff received the faxed information from the FBI.

¶34. The State claims it would have been forced to seek a continuance until the lab results were available if Gray had been charged with capital murder without the DNA evidence. The lower court found that "the DNA analysis conducted by the Bureau could have been exculpatory and beneficial to the Defendant." This Court has previously held the delay in time attributed to the FBI laboratory in preparing potentially exculpatory DNA evidence weighs very slightly, if at all, in favor of the defendant. ***Hull***, 687 So. 2d at 730. Because these test results could have exculpated Gray and benefitted him, this factor is not weighed heavily against the State, if at all.

> (3) **Assertion of the Right**--

¶35. Gray never requested a speedy trial. He moved to dismiss his indictment because of the lack of a speedy trial. Gray asked for the dismissal on October 13, 1995, after a trial date had been set for November 27, 1995. At this motion hearing, Mr. Lee, one of Gray's attorneys, stated, "The Defendant is not jeopardized in any way at this point. In fact, it would be to his benefit for Mr. Thames and I to be adequately prepared to go to trial, which at this time we aren't."

¶36. This Court has dealt with similar situations previously. "In ***Adams*** we observed that a demand for dismissal for violation of the right to speedy trial is not the equivalent of a demand for speedy trial. Such a motion seeks discharge not trial. There we held that a demand for dismissal coupled with a demand for an instant trial was insufficient to weigh this factor in favor of the defendant, where the motion came after the bulk of the entire period of delay had elapsed." ***Perry***, 637 So. 2d at 875

(citing ***Adams v. State***, 583 So. 2d 165, 169-70 (Miss. 1991)). In the case sub judice, Gray filed his motion to quash the indictment for lack of a speedy trial a little over a month prior to his original trial date. In that motion Gray did not request a speedy trial, but moved the lower court to dismiss the charges against him due to a denial of his right to a speedy trial. This factor weighs against Gray. ***Hull***, 687 So. 2d at 730; ***Perry***, 637 So. 2d at 875.

    (4) **Prejudice to the Defendant**--

¶37. The Supreme Court noted that prejudice to the defendant should be examined according to the interests of the defendant which the right to speedy trial is intended to safeguard. ***Barker***, 407 U.S. at 532. Those interests are: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." ***Id.*** However, in ***United States v. MacDonald*** the Court expounded on the interests protected by the right to a speedy trial.

> The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

***United States v. MacDonald***, 456 U.S. 1, 8 (1982).

¶38. Gray was incarcerated in Jasper County from August 15, 1994, until March 15, 1995, on a charge of burglary. His mother, Annie Tatum, testified she visited her son every Sunday in the Jasper County Jail. She stated that he appeared to be nervous, wanted her to get him a lawyer, and "wanted him to find out what was going on" by talking to the Sheriff. He attempted to take his life on two separate occasions, once by hanging and another by overdosing on pills. Mrs. Tatum testified that she could not afford to retain a lawyer for her son at that time.

¶39. The record clearly shows that Gray had an attorney appointed by the court to represent him on the burglary charge for which he was being held in Jasper County. Gray had an initial appearance on that charge and a bond was set. Gray did not make the bond and remained in jail. Sheriff Cross testified that if Gray had made his bond he would have been transported back to Newton County to face a separate felony drug charge.

¶40. The Court holds that the period of incarceration Gray endured in Jasper County prior to being charged with capital murder on March 15, 1995, in Newton County was attributable to the burglary charge. He would have been released upon making bail, only to be incarcerated in Newton County on a felony drug charge. Gray would have remained in jail between August of 1994 and March of 1995 even if he had not been charged with capital murder.

¶41. Gray was arrested in March of 1995 for capital murder of Grace Blackwell. He was indicted in August of 1995. His trial date was originally set for November 27, 1995. After he was granted a continuance, Gray's trial began on January 22, 1996. There was no oppressive pretrial incarceration, and no prejudice was suffered by Gray as a result of this incarceration.

¶42. The testimony by Annie Tatum suggested that Gray suffered anxiety and nervousness during his incarceration in Jasper County. Any suffering endured by Gray was during the time he was charged for the burglary. Although Gray may have been a suspect for the murder of Mrs. Blackwell, he suffered no anxiety because of the capital murder charge against him. Gray was not charged with capital murder until March of 1995 when he was transported to Newton County. The record does not indicate any anxiety or nervousness suffered by Gray while he was held in Newton County.

¶43. The last interest enumerated in *Barker* is the possibility of impairment to the defense. *Barker, 407 U.S. at 532*. Gray raised several facts that he claims impaired his defense. The first is that he had no attorney during his time of incarceration in Jasper County. The record clearly refutes this claim. Sheriff Cross testified that Gray had an attorney appointed for him to defend him on the burglary charge for which he had been arrested. No capital murder charge had been brought against Gray until March 15, 1995. No attorney would have been appointed for Gray to defend him on that charge until after it had been brought.

¶44. Secondly, Gray claims that a witness named Latrelle Page could have testified for him, but had been killed in a car accident in May of 1995. "If witnesses die or disappear during a delay, the prejudice is obvious."*Id.* Mrs. Tatum testified that Gray had told her Page could testify to help him or possibly clear him of this crime. When cross-examined by the State, Mrs. Tatum stated that she did not know what Page knew or would say. She stated Gray told her before May of 1995 that Page knew what happened.

¶45. The allegations concerning a witness who would testify to exonerate the defendant are unfounded. The trial judge noted that the question was put forth as to what the person would have testified to and no response was given. This was merely supposition. There can be no prejudice to the defendant when the possibility is insubstantial, speculative and premature.

¶46. The attorneys defending Gray against the capital murder charges were appointed on March 22, 1995. The record before this Court is void of any attempt by Gray or his attorneys to secure the testimony of Latrelle Page prior to his death in May of 1995. Mrs. Tatum testified that Gray told her about Page before May of 1995. This factor weighs against Gray. This Court has held that the failure to attempt to secure a witness is fatal to the claim of actual prejudice. *Rhymes*, 638 So. 2d at 1274.

¶47. Thirdly, Gray claims that the testimony of witness inmates, Russell Saunders and Cleveland McCall, who heard incriminating statements by Gray may have never taken place if he had an attorney. This assertion is without merit. Statements made to Russell Saunders were made in either August or September of 1994. While Gray did not have an attorney appointed to defend the capital murder charges until March of 1995, he did have an attorney appointed to represent him as to the burglary charges. McCall testified that the statements made by Gray to him were in October or November of 1995[1] while Gray was incarcerated in Newton County. The attorneys appointed to defend him on the capital murder charge were appointed on March 22, 1995.

¶48. Gray's argument to this Court that if he had an attorney he might not have made the statements to Saunders and McCall is without merit. The record clearly shows that he had representation during the time these statements were made. In fact, at the time he made the statements to McCall in October or November of 1995, Gray was represented by his court-appointed attorneys who defended him against the capital murder charges.

¶49. Lastly, Gray claims he pled guilty to three unrelated felonies in September of 1995 in Jasper County, which made him a convicted felon for cross-examination purposes. He alleges this deterred him from testifying in his own defense. The footnote on page 23 of Gray's appeal brief states his pleading guilty was done without the consent or knowledge of his attorneys. Because the attorneys were appointed in March of 1995, they should have known of this action by Gray in September of 1995. This factor weighs against Gray in his claim of prejudice.

¶50. The State also asserts that the United States Supreme Court has held that the right to a speedy trial does not require the government to formally accuse a person of a crime within any particular period of time.

> In *United States v. Marion*, 404 U.S. 307, 313 (1971), we held that the Speedy Trial Clause of the Sixth Amendment does not apply to the period before a defendant is indicted, arrested, or otherwise officially accused:
>
> "On its face, the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution. These provisions would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time. The Amendment would appear to guarantee to a criminal defendant that the Government will move with the dispatch that is appropriate to assure him an early and proper disposition of the charges against him."

*MacDonald*, 456 U.S. at 6-7.

¶51. The Court further stated, "[a]lthough delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment,. . ., or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending." *Id.* at 7.

¶52. Gray was not formally accused of capital murder until he was arrested on March 15, 1995, and transported to the Newton County jail. The record indicates that Gray was not indicted for the burglary of Mrs. Blackwell's home. However, the record does reveal that counsel was appointed to represent Gray on that burglary charge. Any speedy trial claim or violation of due process allegation would be associated with the burglary charge for which he was arrested on August 15, 1994.

¶53. After deducting the time attributable to Gray's motion for continuance, the length of delay is 247 days. This is very close to the "eight month measuring stick" used by this Court. The overall delay was not excessive for a capital murder case. As noted by the lower court, Gray was in a position to benefit from the DNA evidence if it exculpated him from being prosecuted for the murder of Mrs. Blackwell.

¶54. Gray has failed to show that the State intentionally held back its prosecution in order to gain some impermissible advantage at trial. Where the delay is not intentional and there is no showing of actual prejudice, the balance should be struck in favor of rejecting Gray's speedy trial claim. *Rhymes*, 687 So. 2d at 1275.

¶55. The Court holds that Gray was not denied his right to a speedy trial. His argument is without

merit.

## II. WHETHER THE COURT ERRED BY ADMITTING HEARSAY EVIDENCE.

¶56. Gray's second argument on appeal contends the testimony of Arlene McCree constituted impermissible hearsay. McCree was the bank teller who waited on Mrs. Blackwell at the Peoples Bank of Louin drive-through window on the morning of August 15, 1994. She testified that when she asked Mrs. Blackwell if there was anything wrong or if she had someone with her, she received no response from Mrs. Blackwell. McCree stated that she heard Mrs. Blackwell over the bank's drive-through speaker saying "I'm hurrying, I'm hurrying" as she drove off.

> A: . . .and I asked her one last time was someone in the car with her, and couldn't get anything out of her, and I finally, you know, pushed the button to let the tray out, and when I did that, she reaches in and grabs it, and then I'm tying to let the tray back, and she takes off, and she was always a careful driver, and the car just jerks it down and pulls out, and I could hear a voice on the speaker saying--
>
> BY MR. LEE: Wait just a minute now. I am going to object to what she heard over the speaker, Your Honor.
>
> BY THE COURT: Did you recognize the voice of Mrs. Blackwell?
>
> A: Yes, sir. It was Mrs. Blackwell saying, "I'm hurrying, I'm hurrying."
>
> BY THE COURT: Objection overruled.
>
> Q: (Turner) What was Mrs. Blackwell saying as she was pulling away?
>
> A: "I'm hurrying, I'm hurrying."
>
> Q: Was she speaking to you?
>
> A: I have no idea. She was looking out. I didn't think she was speaking to me, and that's when I thought I was right.

¶57. Prior to this colloquy, McCree testified that she had known Mrs. Blackwell since 1980, when McCree began working at the bank. McCree considered Mrs. Blackwell a friend and tried to wait on her when she came into the bank. McCree stated that on the morning of August 15, 1994, Mrs. Blackwell would not engage in conversation with her and would not even look at her, which was highly unusual. She further testified that Mrs. Blackwell requested $1200 dollars and presented a blank check. McCree stated that Mrs. Blackwell always filled out her checks, which were normally for not more than $100. McCree filled out the check for her and returned it for her to sign. McCree described Mrs. Blackwell as acting out of the ordinary because "she was not conducting normal business."

¶58. Gray argues that hearsay evidence is incompetent. *Murphy v. State*, 453 So. 2d 1290, 1294 (Miss. 1984). Without any further citation, he claims that McCree's repeating Mrs. Blackwell saying "I'm hurrying, I'm hurrying" could not be admitted as an exception to hearsay under Miss. R. Evid. 803 as a present sense impression or excited utterance because this was a response to an apparent

order or directive.

¶59. The State submits the statement was not hearsay. We agree. A statement is hearsay if it is an assertion. Miss. R. Evid. 801(a). The statement was not offered to prove the truth of the matter asserted. Miss. R. Evid. 801(c). The statement was not offered to prove that Mrs. Blackwell was hurrying. The statement was directed at someone else and likely was not intended to be heard by McCree. This Court has held that a statement offered for the fact that it was said does not fit the definition of hearsay. *See Knight v. State*, 601 So. 2d 403, 406 (Miss. 1992). The Court holds that the statements were not hearsay, and the issue is without merit.

### III. WHETHER THE COURT ERRED IN RULING ON THE DEFENDANT'S MOTION TO PROHIBIT PROSECUTORIAL MISCONDUCT PRIOR TO TRIAL.

¶60. Gray filed a motion prior to trial to prohibit prosecutorial misconduct. The lower court stated that the motion would be ruled upon during the trial upon timely objection. Gray speculatively argues that had the lower court sustained the motion prior to trial, the allegedly impermissible arguments to the jury by the prosecution might not have been made.

¶61. First, Gray does not cite any authority to support his claim that the lower court should have made such a ruling prior to trial. "This Court has repeatedly held that failure to cite authority may be treated as a procedural bar, and it is under no obligation to consider the assignment." *Weaver v. State*, No. 95-KA-01034-SCT, 1997 WL 703057, at \*4 (Miss. Nov. 13, 1997) (citing *McClain v. State*, 625 So. 2d 774, 781 (Miss. 1993)). "If a party does not provide this support this Court is under no duty to consider assignments of error when no authority is cited." *Hoops v. State*, 681 So. 2d 521, 526 (Miss. 1996). This assignment of error is procedurally barred.

¶62. Alternatively, it is without merit. The trial court did not abuse its discretion by holding it would rule on the motion upon timely objection. Prosecutors are presumed to act in accordance with the Constitutions of both the United States and Mississippi, along with binding case law, rules of court, and rules of professional conduct. It would have been next to impossible for the trial judge to have covered with an admonition every potential act, if committed by the prosecution, that would have constituted misconduct. Attorneys are expected to act according to the parameters set forth above. Any deviation from such binding authority could have been dealt with by the lower court upon the defense entering a timely objection. Gray's assertion that had the lower court sustained the motion and instructed the prosecution to refrain from such conduct his argument would probably be moot is purely supposition.

### IV. WHETHER COMMENTS MADE BY PROSECUTOR DURING CLOSING ARGUMENTS VIOLATED THE DEFENDANT'S RIGHTS TO A FAIR AND IMPARTIAL TRIAL.

### GUILT PHASE--

¶63. In the closing argument of the guilt phase portion of the trial, the State made the following argument:

BY MR. TURNER: We presented so much evidence against this Defendant that the only

reasonable verdict in this case is guilty of capital murder, and I know that, and you know that, Mr. Duncan knows that, the Defense lawyers know that, the Judge knows that, and everybody sitting in this room for the last three days knows that.

BY MR. LEE: Your Honor, wait just a minute. I am going to object to that. That was improper argument, pointing out who should know that, the Court should know it. That is very improper, Your Honor, and I am going to object to that.

BY THE COURT: A lawyer is given great latitude in making his closing arguments. That is the attorneys for the State and the Defendant. He is entitled to argue the facts of a case and the inferences flowing from those facts, and his conclusions known to himself and to others. He is entitled to make an expression as to what the evidence indicates.

Your objection is overruled.

¶64. Gray contends that allowing the State to inject that the judge and the defense attorneys know the only reasonable verdict was guilty of capital murder shocks the conscience. Gray also argues that by overruling the objection the judge gave credence to the statements made by the State that the only reasonable verdict was guilty of capital murder. Gray correctly asserts that this Court has warned prosecutors to "'refrain from interjecting personal beliefs into presentation of their cases.'" *Hunter v. State*, 684 So. 2d 625, 637 (Miss. 1996) (quoting *Chase v. State*, 645 So. 2d 829, 854-55 (Miss. 1994).

¶65. Attorneys "in a criminal prosecution are given broad latitude during closing arguments." *Ballenger v. State*, 667 So. 2d 1242, 1269 (Miss. 1995) (quoting *Ahmad v. State*, 603 So. 2d 843, 846 (Miss. 1992)). The State "'may comment upon any facts introduced in evidence' and 'may draw whatever deductions seem to [it] proper from these facts.'" *Hunter*, 684 So. 2d at 637 (citation omitted).

¶66. Gray contends that the great latitude given to prosecutors does not allow them to argue to the jury what the judge or the defense attorneys know. Further, he states that such comments by prosecutors cannot be considered expressions as to what the evidence indicates.

¶67. The comments of the State in closing argument must be considered in the context they were made. *Wilcher v. State*, 697 So. 2d 1087, 1112 (Miss. 1997). The State contends that it was emphasizing the weight of the evidence. The State claims it was arguing to the jury that anyone who had watched the trial and heard the evidence would agree that the only reasonable verdict was guilty of capital murder.

¶68. The Court has previously ruled on personal opinion comments in *Blue v. State*, 674 So. 2d 1184 (Miss. 1996). There the Court held

We find that the prosecutor's comments regarding Blue's guilt and the punishment due him were not personal opinion comments. The prosecutor never said that *she* believed Blue was guilty or that *she* believed that Blue deserved the death penalty. Reviewing the statements in context, the prosecutor simply argued that the evidence adduced at trial proved guilt beyond a reasonable doubt and supported a penalty of death.

*Id.* at 1208.

¶69. The statements in the case presently before the Court are somewhat different. The prosecutor stated, "We presented so much evidence against this Defendant that the only reasonable verdict in this case is guilty of capital murder, and I know that, and you know that, Mr. Duncan knows that, the Defense lawyers know that, the Judge knows that, and everybody sitting in this room for the last three days knows that." However, like the prosecutor in *Blue*, the prosecutor in the case presently before the Court did not say he believed the defendant was guilty. Rather, he stated that based on the evidence that had been presented everyone knew the only reasonable verdict was guilty of capital murder. The prosecutor argued the evidence proved guilt beyond a reasonable doubt. *Blue*, 674 So. 2d at 1208.

¶70. These statements come perilously close to the type of statements this Court has warned prosecutors to avoid using in the presentation of their cases. *Hunter*, 684 So. 2d at 637. The Court is mindful that our decisions in *Hunter* and *Blue* were handed down after this case was tried. *Blue* was decided by this Court on February 15, 1996, and the motion for rehearing was denied on June 6, 1996. *Hunter* was decided on June 27, 1996, and modified on denial of rehearing on December 5, 1996. The prosecution in this case did not have the benefit of these two cases when it tried this case on January 22, 1996.

¶71. Because of our holdings in *Blue* and *Hunter*, we cannot say these statements were not error. However, in light of the overwhelming evidence in this case against Gray, we also cannot say the jury verdict was influenced by the prosecutor's argument so as to prejudice Gray. "Where a prosecutor has made an improper argument, the question on appeal is 'whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created.'" [Wells v. State, 698 So. 2d 497, 507 (Miss. 1997)](quoting *Davis v. State*, 530 So. 2d 694, 701 (Miss. 1988)).

¶72. Because of the overwhelming evidence of guilt, we hold that any error does not rise to the level of reversal. We take this opportunity to once again emphasize our criticisms and concerns from our holdings in *Blue* and *Hunter* with regard to personal belief comments interjected into arguments by the prosecution. Simply put, it should not be done.

### SENTENCING PHASE--

¶73. Gray claims that during the sentencing phase the prosecutor made an improper argument. The prosecutor stated the following:

> BY MR. DUNCAN: In prison, if that's what you decide to give Rodney Gray, he is still going to have a certain quality of life. Granted it won't be the best in the world, but he will still have it. He will still be able to look out and see the sunshine. He will still have a relationship with his family, if they choose to have one with him. He will be able to talk to them, visit with them, communicate with them, and enjoy certain things, but Grace Blackwell's family, their only relationship with her will be their memories of her, their prayers, and visiting her in the graveyard. Grace Blackwell had a great-grandchild that she will never know. She has got a daughter, grandchildren, great-grandchildren, that have been cheated out of years--

BY MR. LEE: Your Honor, I--

BY MR. DUNCAN: --of relationship--

BY MR. LEE: Wait just a minute, Mr. District Attorney. I am going to have to interpose an objection to this. This is not proper as to this crime that was committed, Your Honor. I am going to object to it.

BY THE COURT: I am going to sustain the objection.

BY MR. LEE: I would ask that the jury disregard it.

BY THE COURT: Motion overruled.

¶74. Gray complains that the lower court compounded the problem by refusing to instruct the jury to disregard the remarks made by the prosecutor after ruling them to be improper. "Where counsel lacks the self-discipline necessary to avoid arguments such as these, that discipline should be imposed by the trial judge from the bench." *Bridgeforth v. State*, 498 So. 2d 796, 801 (Miss. 1986). "The purpose of closing argument is to enlighten the jury, not to enrage it." *Id.*

¶75. The State responds that Gray's reliance on this Court's holding in *Bridgeforth* is misplaced. In the case at bar, the State did not vilify Gray. The prosecuting attorneys commented on the evidence that had been presented to the jury. The prosecution was attempting to enlighten the jury by giving a summation on the victim impact evidence that had just been presented. The State contends that it was not necessary for the judge to admonish the jury since victim impact evidence is proper for the jury to consider. "This Court found in *Hansen v. State*, 592 So. 2d 114 (Miss. 1991), and in numerous cases since, that such argument is not prohibited pursuant to the U.S. Supreme Court's holding in *Payne v. Tennessee*, 501 U.S. 808, 1115 S.Ct. 2597, 115 L.Ed.2d 720 (1991)." *Chase v. State*, 699 So. 2d 521, 537 (Miss. 1997). Further, the State submits the impact of the murder on the victim's family is part of the crime committed by the defendant. The United States Supreme Court has held that juries "should consider the circumstances of the crime in deciding whether to impose the death penalty." *Tuilaepa v. California*, 512 U.S. 967, 976 (1994).

¶76. When looking at the entire closing arguments of the State during both the guilt phase and the sentencing phase of the trial any misconduct does not rise to the level of reversible error. "To constitute a due process violation, the prosecutorial misconduct must be ('of sufficient significance to result in the denial of the defendant's right to a fair trial')." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (citation ommitted).

¶77. These isolated statements by the prosecution did not deprive Rodney Gray of a fair trial. These comments standing alone were not sufficient to cause the jury to convict Gray of capital murder and sentence him to death. The evidence was overwhelmingly in favor of those verdicts. The guilty verdict was returned in ten minutes, and the sentence of death was returned in an hour.

¶78. Based on the overwhelming weight of the evidence, it cannot be said that but-for the prosecutors' statements Rodney Gray would have not been convicted or received a lighter sentence. This issue does not require reversal.

## V. WHETHER THE COURT ERRED BY ALLOWING THE STATE'S DNA EXPERT TO TESTIFY ABOUT TEST RESULTS SHE DID NOT PERSONALLY CONDUCT.

¶79. The State's DNA expert, Melissa N. Smrz, testified as to her conclusions that the semen stains collected from the panties of Mrs. Blackwell and the blood samples taken from Gray contained the same DNA. Gray argues that the lower court erred by not excluding her testimony because she did not personally conduct the DNA testing, her testimony was hearsay and a denial of his constitutional right to confrontation and cross-examination.

¶80. Ms. Smrz testified that everything up to the point of evaluating the autoradiographs and doing the sizing and writing the report is done by someone else. She stated that a technician under her supervision ran the tests and created the autoradiographs. But, she actually evaluated the autoradiographs and did the sizing procedure.

¶81. On cross-examination Ms. Smrz testified as follows:

> Q. Okay. I don't want to repeat myself, but you are in actuality testifying before this jury what somebody under you actually did, and you are verifying the results?
>
> A. That is correct. My role is somewhat like a doctor in a hospital who has a lot of individuals who work on patient information or patient data, like a laboratory technician, or a nurse, or X-ray technician, and then that doctor is responsible for putting all that information together and evaluating and making diagnosis. It is a similar role.

¶82. On redirect, she testified a mistake in the testing would not cause a false identification.

> Q. And, when you review the results and supervise these tests, if there were a mistake to be made, would that in any way be able to somehow make a match where there was no match, or would it just result in no result at all?
>
> A. If the DNA test isn't done correctly, in that some chemical or correct chemical is not used, or the electrophores is procedure is run too long, something that is not followed as part of the protocol, or if you will, recipe for that particular test, the test will not work, and we can tell that by the control that we use.
>
> The only type of error, what you are talking about, having a sample match when it really didn't, would be a sample mixup, and that is a human error. Again, with the chemicals and everything that we use, we know from the results of our control work that we did the test correctly, and in our laboratory we take great pains and a lot of quality control to make sure there are no sample mixups.
>
> I showed you on the diagram that we have our known samples separated from our questioned samples, so that you don't accidentally get a known sample put into a questioned lane.
>
> We also handle one sample at a time. We are working anytime on the bench one case at a time. We don't have a lot of cases out on the same bench where there would a chance for a mixup.

¶83. At the conclusion of Ms. Smrz's testimony, Gray moved that it be excluded.

BY MR. LEE: Your Honor, I would first like to make a motion to exclude the testimony of the witness Smrz for the reason by her own testimony, she did not perform these tests. All she did was read the results. She has even testified that she probably was not even in the laboratory or in her office when these tests were run. That these tests were performed by people under her. So, all she can testify to is that they were supposedly done through the procedures established by the FBI laboratory, but she doesn't have firsthand knowledge of these tests actually being performed.

Therefore, we are going to ask that her testimony be stricken and the jury ordered to disregard it.

BY THE COURT: I think Mrs. Smrz has satisfactorily explained the procedure that is followed there in her department, in that she is the head of that department. That the tests were performed under her direction and control, and that she herself verified the results of the tests made by others.

She gave a satisfactory explanation and compared it to a physician who has nurses and X-ray technicians and others who perform tests, but she makes an analysis of those tests and gives her conclusions.

Therefore, your motion is overruled.

¶84. "The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." *McIlwain v. State*, 700 So. 2d 586, 590 (Miss. 1997) (citing *Hentz v. State*, 542 So. 2d 914, 917 (Miss. 1989)). Further, "[t]he qualifications of an expert in fields of scientific knowledge is left to the sound discretion of the trial judge." *Hall v. State*, 611 So. 2d 915, 918 (Miss. 1992). The trial judge's discretion must be within the boundaries of the Mississippi Rules of Evidence. *McIlwain*, 700 So. 2d at 590.

¶85. Ms. Smrz's testimony was clearly admissible according to Miss. R. Evid. 703. Miss. R. Evid. 703 provides:

The facts of data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

**Comment**

There are three possible sources which may produce an expert's facts or data. Practice in Mississippi already recognizes two of them: (1) where the expert bases his opinion on personal observation, and (2) where he bases it either on a hypothetical question presented to him at trial or on the trial testimony of others which the expert has heard while sitting in the courtroom. *See Collins v. State*, 361 So. 2d 333 (Miss.1978). **The new practice under Rule 703 brings a third source: the presentation of data to the expert outside of court and other than by his personal observation.** The Advisory Committee's Note to FRE 703 presents a persuasive rationale for the use of the third source. **A physician, for example, bases his medical**

**diagnosis of his patient on many sources. Most of his sources are admissible in evidence but only with the expenditure of substantial time in producing and examining various authenticating witnesses. Since these sources provide the doctor with information that he utilizes in making life-and-death decisions, his validation of them ought to be sufficient for trial, especially since he can be cross-examined.**

Miss. R. Evid. 703 and cmt. (emphasis added).

¶86. Ms. Smrz testified that the procedures used in her lab to extract and test DNA is the same procedure used "in the country and throughout the world, but it is also used in medical diagnostic laboratories and paternity testing laboratories." She stated this was the procedure generally accepted within the scientific community as reliable. Ms. Smrz compared herself to a doctor who analyzes patient information collected by nurses, laboratory technicians, or X-ray technicians, and makes a medical diagnosis based on that information.

> Rule 703 allows an expert to base his opinion on the opinions of others which are not in evidence so long as experts in the field ordinarily rely on such opinions in forming their own opinions. For example, a psychiatric expert may rely on the reports of a patient's psychiatric history in arriving at his diagnosis. In such circumstances, the opinion of the nontestifying expert would serve simply as a premise supporting the testifying expert's opinion on a broader issue. . . .

*Hull*, 687 So. 2d at 716 (quoting *Kim v. Nazarian*, 216 Ill.App.3d 818, 159 Ill. Dec. 758, 764-65, 576 N.E.2d 427, 433-34 (1991)).

¶87. The testimony of Ms. Smrz is the third source of expert testimony referred to in the comment to Miss. R. Evid. 703. Ms. Smrz based her opinion and testimony on her analysis of the DNA extracted by technicians under her control. The Court finds her testimony was permissible under Miss. R. Evid. 703.

¶88. Gray contends that he could not cross-examine Ms. Smrz as to how the actual tests were performed, other than what the procedure was, thus denying him his right to cross-examine and confront those who actually performed the tests. Although Gray did not specifically raise a Sixth Amendment Confrontation Clause objection, the objection raised was sufficient to preserve this question for consideration on appeal.

¶89. Gray relies on *Kettle v. State*, 641 So. 2d 746, 749-50 (Miss. 1994), where the prosecution attempted to introduce results from laboratory testing through a records custodian, not an expert. The Court reversed holding the "defendant was entitled to have the person who conducted the test appear and testify in person." *Id.* at 750. In *Barnette v. State*, 481 So. 2d 788, 791 (Miss. 1985), the Court held that "a defendant's confrontation clause rights were violated where the analyst who performed certain tests was not available to testify." *Hull*, 687 So. 2d at 717. The Court in *Hull* found no error where the defendant faced the scientist who actually performed the tests. *Id.*

¶90. In the case sub judice Gray was able to confront and cross-examine the expert who evaluated the autoradiographs and did the sizing procedure, Ms. Smrz. She based her opinions and testimony on the results of her examinations of the test results. This was permissible testimony under Miss. R.

Evid. 703 and did not violate Gray's Sixth Amendment right to confront witnesses. He was able to cross-examine and confront Ms. Smrz. Therefore, this issue is without merit.

### VI. WHETHER THE COURT ERRED BY ALLOWING THE STATE TO INTRODUCE INTO EVIDENCE THE GRUESOME PHOTOGRAPHS AND VIDEO TAPE OF THE BODY OF THE VICTIM.

¶91. Gray argues that the State, over his objection, introduced into evidence a series of gruesome photographs and a video tape[2] of the victim that unfairly prejudiced him because it incited and inflamed the jury. Photographs of bodies are admissible as long as they have probative value, and are not so gruesome as to be overly prejudicial and inflammatory. *Stringer v. State*, 500 So. 2d 928, 934 (Miss. 1986).

¶92. This Court's position as to the admissibility of photographs is well settled.

> In *Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995), this Court found that photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, *Williams v. State*, 354 So. 2d 266 (Miss. 1978); describe the location of the body and cause of death, *Ashley v. State*, 423 So. 2d 1311 (Miss. 1982); or supplement or clarify witness testimony, *Hughes v. State*, 401 So. 2d 1100 (Miss. 1981).
>
> The admissibility of photographs rests within the sound discretion of the trial court. *Jackson v. State*, 672 So. 2d 468, 485 (Miss. 1996); *Griffin v. State*, 557 So. 2d 542, 549 (Miss. 1990); *Mackbee v. State*, 575 So. 2d 16, 31 (Miss. 1990); *Boyd v. State*, 523 So. 2d 1037, 1039 (Miss. 1988). Moreover, the decision of the trial judge will be upheld unless there has been an abuse of discretion. *Westbrook*, 658 So. 2d at 849. The "discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Hart v. State*, 637 So. 2d 1329, 1335 (Miss. 1994)(quoting *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987)).

*Brown v. State*, 690 So. 2d 276, 289 (Miss. 1996). "The same standards applicable to determining the admissibility of photographs are applicable to video tapes." *Blue*, 674 So. 2d at 1210; *See Holland v. State*, 587 So. 2d 848, 864 (Miss. 1991).

¶93. The State submits that all of the photographs admitted into evidence had significant probative value. State's Exhibit 3 was used by the prosecution to identify the victim in the case, Mrs. Grace Blackwell. It was also used by investigators to describe the injuries to Mrs. Blackwell that they observed when they arrived at the scene. Dr. Hayne used State's Exhibit 3 extensively in his description of Mrs. Blackwell's wounds. State's Exhibit 4 was also used to identify the victim and her condition at the crime scene. Dr. Hayne referred to State's Exhibits 4 and 33 to illustrate the large gash and laceration found on Mrs. Blackwell's leg. He testified that the wounds had little blood indicating they were sustained after she was shot when she was either hit by the car or fallen or pushed from the car.

¶94. State's Exhibit 5 was used to identify the victim and describe her condition when her body was found. Dr. Hayne testified using State's Exhibit 5 to describe the entrance wound and the wound track of the shotgun wound to Mrs. Blackwell's mouth. He showed the jury the powder residue

visible on the picture indicating it was a contact wound.

¶95. State's Exhibit 31 was used by Dr. Hayne to describe the gaping cuts sustained by Mrs. Blackwell produced by the exit shotgun wound. State's Exhibit 32 was used by Dr. Hayne to explain the multiple gunshot pellet wounds, as well as the smaller secondary missile fragment wounds. The State used this testimony to prove its theory that Mrs. Blackwell was shot in the passenger seat through the driver's side car window.

¶96. Lastly, State's Exhibit 34 was necessary to show the injury to Mrs. Blackwell's vaginal vault. The picture illustrated the one inch abrasion that Dr. Hayne testified was caused by force. This photograph was probative to convince the jury that any sexual intercourse which occurred was not consensual. Any prejudicial effect this photograph may have had on the jury was outweighed by its probative value.

¶97. We hold that the photographs were not introduced into evidence as an attempt by the prosecutor to incite or inflame the jury so as to unfairly prejudice Gray. Rather, the prosecution introduced the photographs to accurately depict the injuries sustained by the victim causing her death and the crime scene as it was discovered by the investigating officers. Although the photographs are not attractive, they are permissible when they accurately depict the wounds suffered by the victim and the posture of body at the scene of the crime. *Brown*, 690 So. 2d at 289. The lower court did not abuse its discretion in admitting the photographs into evidence.

¶98. State's Exhibit 30, the video tape, was narrated at trial by Chief Deputy Ron Davis. The defense attorneys objected to parts of the video where the camera zoomed in on certain parts of Mrs. Blackwell's body. The tape was played for the court with the jury out so that the lower court could make a determination as to its admissibility. Mr. Lee, one of Gray's attorneys, objected to the portion of the video that shows Mrs. Blackwell's body being moved onto a stretcher. The Court held the views of the body were admissible, but the removal of the body to the stretcher was not. However, the prosecutor stopped showing the tape prior to the closeup scenes of Mrs. Blackwell's body, which was the basis of Mr. Lee's objection. The jury did not see this portion of the tape.

> BY THE COURT: All right. Now, on the record, the District Attorney, Mr. Lee, has announced that he stopped showing the video there at the scene where it was showing the bridge, without showing the features of the body. That was your objection that it was gruesome and prejudicial. So, that has not been shown to the jury. Do you understand that?

> BY MR. LEE: Yes, sir.

> BY THE COURT: The record will so reflect that only the physical body itself was shown and not the closeup view that Mr. Lee objected to.

> BY MR. LEE: All right.

¶99. The State submits this issue as it pertains to the video tape is moot since the objectionable portions were not shown to the jury. We agree. Further, any other objection Gray might have on appeal has not been argued in his brief. Even if there were other objections raised, they are procedurally barred. Gray failed to raise any other objection to the video tape other than the one

discussed above. Therefore, the procedural bar should be applied. *See Lester v. State, 692 So. 2d 755, 772 (Miss. 1997)*; *Davis v. State*, 684 So. 2d 643, 658 (Miss. 1996); *Williams v. State*, 684 So. 2d 1179, 1193 (Miss. 1996); *Blue*, 674 So. 2d at 1208.

¶100. The State did not seek to incite or inflame the jury by the introduction of the photographs and video tape. The lower court did not abuse its discretion by admitting the photographs and video tape into evidence. Furthermore, the jury did not see the portion of the video tape that was objectionable to the defense. Clearly, any alleged prejudicial effect on the jury was outweighed by the probative value of this demonstrative evidence.

### VII. WHETHER THE COURT ERRED BY ADMITTING A PHOTOGRAPH OF THE VICTIM INTO EVIDENCE BY A WITNESS WHO WAS NOT AT THE CRIME SCENE.

¶101. As discussed above, the admissibility of photographs is within the sound discretion of the trial judge. *Alexander v. State*, 610 So. 2d 320, 338 (Miss. 1992); *Ladner v. State*, 584 So. 2d 743, 753-54 (Miss. 1991). Unless an abuse of that discretion can be shown, the lower court's decision will be upheld on appeal. *Taylor v. State*, 672 So. 2d 1246, 1270 (Miss. 1996).

¶102. Arlene McCree, the bank teller, was the third witness for the State. McCree testified that she had cashed a check for Mrs. Blackwell on the morning of August 15, 1994. The prosecution presented McCree with State's Exhibit 3 for the purposes of identifying Mrs. Blackwell. This photograph was admitted into evidence through McCree's testimony.

¶103. Gray's attorney, Mr. Lee, objected to the admission of the photograph stating it was irrelevant at that point in the trial and could only serve to inflame and prejudice the jury. This objection was overruled. On appeal, Gray argues that no testimony had been introduced as to the cause of death or the circumstances under which the death occurred at the time McCree testified. Therefore, the admission of the photograph, State's Exhibit 3, through the testimony of McCree was an abuse of the lower court's discretion.

¶104. The State responds that the photograph had probative value. The picture was presented to McCree by the prosecution to identify Mrs. Blackwell.

> Q. Mrs. McCree, you said you have known Mrs. Blackwell since approximately 1980 when you began working at the bank; is that correct?
>
> A. Yes, sir.
>
> Q. I need to show you this picture and ask if you can identify this as Mrs. Blackwell?
>
> A. Yes, sir.

Gray acknowledges this in his brief, but then argues the photograph has no probative value.

¶105. The Court finds that the admission of the photograph, State's Exhibit 3, was not an abuse of the lower court's discretion. The photograph was admitted through the testimony of McCree to identify Mrs. Blackwell. It was an integral part of the State's case to prove that the person in the

picture who had been found dead and identified as Mrs. Blackwell was the same person that McCree had waited on at the bank.

¶106. Even if the photograph had not been admitted through the testimony of McCree, the State contends it would have been admitted during Dr. Hayne's testimony. Any error committed by the trial judge in admitting the photograph through the testimony of McCree was harmless. We agree and hold this issue is without merit.

### VIII. WHETHER THE COURT ERRED BY ALLOWING AN INSTRUCTION TO THE JURY AS TO RAPE, WHEN THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT SUCH AN INSTRUCTION.

¶107. Gray claims as his eighth assignment of error that the jury was improperly instructed on the underlying felony of rape. The prosecution offered Instruction S-6 to define the crime of rape.

> The Court instructs the Jury that any person who shall forcibly ravish any female above the age of fourteen (14) years by having sexual intercourse with said female against her will by the use of force or by the threat of personal injury shall be guilty of the crime of rape.

¶108. Gray contends this instruction did not properly instruct the jury on the underlying elements of the crime of rape. Gray asserts that a necessary element of the crime of rape is that some penetration of the female's private parts by the sexual organ of the assailant must occur. *Lang v. State*, 230 Miss. 147, 158, 87 So. 2d 265, 268 (1956). The State must prove each element of the crime beyond a reasonable doubt, and must ensure the jury has been properly instructed with regard to the elements of the crime. *Hunter*, 684 So. 2d at 635.

¶109. At trial Gray's attorney, Mr. Lee, objected to Instruction S-6 being given.

> [BY THE COURT:] What do you say to S-6?

> BY MR. LEE: I am going to object to that instruction. There is no evidence showing that there was any forcible rape.

> BY THE COURT: It is given. S-7?

¶110. The State argues that any claim made by Gray on appeal that the instruction did not properly instruct the jury should be procedurally barred. An objection on one or more specific grounds at trial constitutes a waiver of all other grounds for objection on appeal. *Lester*, 692 So. 2d at 773; *Walker v. State*, 671 So. 2d 581, 605-06 (Miss. 1995); *See Conner v. State*, 632 So. 2d 1239, 1255 (Miss. 1993). The procedural bar is applied. Gray objected to the instruction being given because he thought the evidence was insufficient to grant such an instruction. He never complained that Instruction S-6 did not specifically enumerate the elements of the crime of rape such the jury was improperly instructed. The Court will not allow him to expand his objection at trial to encompass other claims for the first time on appeal.

¶111. Alternatively, his argument is without merit. Gray did not offer an instruction for rape. However, Gray asserts that even if he did not present an acceptable instruction, the State is obligated to supply an acceptable instruction. *Hunter*, 684 So. 2d at 635-36. The State contends that a trial

judge is not required to instruct the jury *sua sponte* or to give instructions in addition to those tendered by the parties. ***Ballenger***, 667 So. 2d at 1252. We agree. The instruction given must correctly instruct the jury as to each element of the offense charged. ***Hunter***, 684 So. 2d at 636. "Failure to submit to the jury the essential elements of the crime is 'fundamental' error." ***Id.***(quoting *Screws v. United States*, 325 U.S. 91, 107 (1945)).

¶112. Gray claims "sexual intercourse" was insufficient to inform the jury that rape meant penetration of a female's vagina by a male's penis. Sexual intercourse is defined as "genital contact or coupling between individuals, **especially one involving penetration of the penis into the vagina.**" Random House Webster's College Dictionary (4th Ed. 1996) (emphasis added).

¶113. The instruction did not have to mention sexual intercourse to have been sufficient. The instruction tracked the statutory language that reads any person is guilty of rape who "shall forcibly ravish any person of the age of fourteen (14) years or upward. . . ." Miss. Code Ann. § 97-3-65 (2) (1994). The instruction specifically instructed the jury that rape occurred when any person "shall forcibly ravish any female. . .by having sexual intercourse with said female against her will by the use of force or by threat of personal injury." The State contends this went beyond informing the jury of the essential elements of rape. The Court agrees. The jury was instructed as to each element of the crime as prescribed by the language in the statute itself.

¶114. Gray correctly notes that the instruction given to the jury did not explicitly require the element of penetration. This is of no consequence. This Court has long held that such an instruction, as given in the case sub judice, sufficiently sets out the elements of rape. *See* ***Rodgers v. State***, 204 Miss. 891, 895, 36 So. 2d 155, 156 (1948)(instructing jury to find defendant guilty if he "violently, forcibly and feloniously and against her will, ravished and carnally knew her"). This Court has held "[r]avish means rape." ***Allman v. State***, 571 So. 2d 244, 248 (Miss. 1990).

¶115. The State submits that Instruction S-6 informed the jury of the necessity of penetration and the use of force. The instruction must be considered as a whole, and the words contained therein given their customary, ordinary and usual meaning. ***Council v. Duprel***, 250 Miss. 269, 303, 165 So. 2d 134, 149 (1964). The terms "rape", "forcibly ravish" and "sexual intercourse against her will" adequately entail in the mind of the ordinary juror the concept of physical penetration of the victim's vagina by the defendant's penis. Where the instruction tracks the statutory language prescribing the elements of the crime, the Court finds it is permissible as adequately instructing the jury as to the elements of the crime.

¶116. Gray's main argument is that the State did not prove he committed the crime of rape beyond a reasonable doubt. He asserts the evidence presented at trial was not sufficient to prove penetration. Thus, Gray claims Instruction S-6 should not have been given. This claim is without merit.

¶117. Because the victim was deceased, the State had to prove beyond a reasonable doubt by mostly circumstantial evidence that Mrs. Blackwell was raped. Gray argued to this Court that ***Lang*** required proof of penetration of the female's private parts by the male's penis as a necessary element of rape. ***Lang***, 230 Miss. at 158, 87 So. 2d at 268. However, Gray failed to read further in the ***Lang*** opinion. This Court held penetration may be established by circumstantial evidence.***Id.***

¶118. Mrs. Smrz testified that semen stains were found in the panties of Mrs. Blackwell. She stated

the source of the stains was Rodney Gray. Semen was found on the vaginal swabs taken from Mrs. Blackwell, but no DNA profile could be extracted. Mr. Wilson testified that the pubic hair found in the crotch area of Mrs. Blackwell's panties contained the same microscopic characteristics as Gray's pubic hair.

¶119. Dr. Hayne testified there was an abrasion or scrape measuring approximately one inch on Mrs. Blackwell's labia majora, which is the fold of the skin located external to the vaginal vault. He testified that force would be necessary to cause such an injury. Gray asked Russell Saunders "if they could tell if you had sex with a woman by taking your blood." Gray then told Saunders that he had sex with the woman he allegedly had killed. Lastly, Gray told Cleveland McCall that he raped Mrs. Blackwell.

¶120. The trial judge correctly instructed the jury to decide whether this murder was committed during the commission of a rape. This Court's standard for reviewing the legal sufficiency of the evidence is as follows:

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence--not just that supporting the case for the prosecution--in the light most consistent with the verdict. We give [the] prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge is required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb. *See*, *e.g.*, *Gavin v. State*, 473 So. 2d 952, 956 (Miss. 1985); *May v. State*, 460 So. 2d 778, 781 (Miss. 1984).

*Roberson v. State*, 595 So. 2d 1310, 1318 (Miss. 1992)(quoting *McFee v. State*, 511 So. 2d 130, 133-34(Miss.1987)).

¶121. In short, the evidence is to be viewed in the light most consistent with the jury's verdict. *Carr v. State*, 655 So. 2d 824, 837 (Miss. 1995). This Court has held the same standard to apply to capital murder cases. *See Mackbee v. State*, 575 So. 2d 16, 36 (Miss. 1990).

¶122. The record before the Court supports a procedural bar to Gray's assertion of this issue. He objected to the sufficiency of the evidence to support Instruction S-6 at trial. He did not allege the instruction failed to properly instruct the jury as to the specific elements of the crime of rape. Alternatively, Gray's argument is without merit. After thoroughly reviewing the record before this Court, we hold there was more than sufficient evidence presented at Gray's trial to support the lower court giving Instruction S-6 to the jury. Furthermore, the instruction was legally sufficient to inform and instruct the jury as to each element of the crime of rape which elevated this murder to a capital offense. Gray's argument is procedurally barred and without merit.

### IX. WHETHER THE JURY VERDICT EVIDENCED BIAS AND PASSION BECAUSE OF THE TIME OF DELIBERATIONS.

¶123. Gray asserts that because the jury deliberated ten minutes on guilt and one hour on sentencing his case should be reversed. On January 24, 1996, the jury retired at 3:11 p.m. to begin deliberations to determine whether Rodney Gray was guilty of the crime charged. At 3:21 p.m. the jury announced ready to report its verdict of guilty. On January 25, 1996, at 12:07 p.m the jury was retired to the jury room to deliberate an appropriate sentence for Rodney Gray. That same day the jury announced it had reached a verdict at 1:09 p.m.

¶124. Gray claims that the jury did not review the exhibits, nor study the instructions. He states the members of the jury only had time to "walk around the table." With no other tangible evidence before this Court in the record, Gray argues that the length of time the jury took for deliberations is evidence of the bias and passion of the jury.

¶125. "This Court has held that there is no formula to determine how long a jury should deliberate." *Smith v. State*, 569 So. 2d 1203, 1205 (Miss. 1990) (citing *Johnson v. State*, 252 So. 2d 221 (Miss. 1971)). The Court in *Johnson* said the following:

> Because the jury's time of considering their verdict did not exceed seven minutes, it does not follow that the jurors did not carefully consider the testimony and the exhibits. It is not only possible but probable that when the state and the defendant had rested and the summations had been made each juror had decided in his mind the issue of innocence or guilt. After the brief deliberation with each other, the jurors found that they were of a single mind as to the guilt or innocence of the appellant and found him to be guilty.

> Under the facts of this case this Court is unwilling to lend its authority to the establishment of any formula or guideline relating to the time a jury must deliberate before delivering its verdict. This Court is cognizant of the fact that in the past in occasional cases, as in the case at bar, rather brief deliberations have taken place in the jury room and verdicts have been returned with unusual rapidity. There is no yardstick of time which a jury should use before reaching a verdict. No two cases are similar as to facts and therefore the law varies in its application thereto. Therefore, we cannot hold that in the time utilized by the jury it could not reach a proper verdict of guilty.

*Smith*, 569 So. 2d at 1205 (quoting *Johnson*, 252 So. 2d at 224).

¶126. Gray argues that in deciding whether a man is guilty of capital murder the jury should be given some guidelines, such as being required to read jury instructions and examine the evidence. He contends the Court should separate capital cases from non-capital cases and provide guidelines in cases where a defendant's life is at stake.

¶127. Gray offers no evidence to suggest the jury did not consider the testimony and exhibits as they were presented. The jury was read the instructions prior to closing arguments by the trial judge. "It is presumed that jurors follow the instructions of the court. To presume otherwise would be to render the jury system inoperable." *Chase*, 645 So. 2d at 853 (quoting *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985)).

¶128. The Court notes that this case was not overly complex, given that it was a capital murder case. The record before the Court provided the jury with ample evidence with which to consider Gray's

guilt or innocence and subsequent sentence. There is nothing in the record to suggest the jury considered anything other than the evidence presented. Likewise, the record does not indicate a need for extended deliberations.

¶129. Gray's assertion that the length of jury deliberations evidenced bias and passion on the part of the jury is specious and without merit. He bases his argument solely on the length of the deliberations. It is illogical to think that a brief deliberation period is necessarily prejudicial to the defendant. A brief deliberation could just as easily indicate an acquittal. The Court holds that any time restrictions or guidelines regarding jury deliberations would usurp the jury system.

¶130. After reviewing the record, the Court holds that the verdict and sentence returned in the case before the Court were not based on bias or passion, but rather the overwhelming weight of the evidence. Gray's argument is without merit.

### X. WHETHER THE COURT ERRED BY FAILING TO GRANT DEFENDANT'S MOTION FOR CHANGE OF VENUE.

¶131. Gray's tenth assignment of error contends the trial judge abused his discretion in refusing to grant a change in venue in this trial. Gray filed his motion for change of venue, accompanied by two affidavits as required by Miss. Code Ann. § 99-15-35 (1994), from Donna Cumberland and Marie Evans. Although the affidavits tracked the language of Miss. Code Ann. § 99-15-35, neither identified the affiant as a resident of Newton County.

¶132. The trial court held a hearing on the matter. The defense did not present any witnesses at the hearing. The State presented six witnesses to prove Gray could receive a fair trial in Newton County. The witnesses were from various parts of Newton County, and all testified that they thought Gray could receive a fair trial. Charles Vance, fire chief of Newton, testified that he came into contact with approximately 150-200 primarily Newton County residents a week. He stated that the incident was not commonplace and some would talk. But, Vance testified he had heard no public ill will against Gray and thought "he could receive as fair a trial [in Newton County] as anywhere else."

¶133. Kate Thomas lived in the northwest portion of Newton County and was campaigning for justice court judge at the time she testified. She stated that she also came into contact with several hundred Newton County residents a week. Gray claims Thomas was biased in light of her affirmative answer to the question, "As a candidate for a Justice Court Judge, it would not be beneficial to you to make a statement that any individual couldn't get a fair trial in Newton County; is that not correct? " She testified that no one had indicated to her that they had prejudged the case or formed an opinion as to the guilt or innocence of Rodney Gray. Thomas did not know who Rodney Gray was prior to receiving her subpoena to testify at the venue hearing. Thomas was of the opinion Gray could receive a fair trial in Newton County.

¶134. Ernie White testified that he lived in the town of Little Rock in Newton County, where he did auto body repair work. The defense attempted to show White had an interest in the case being tried in Newton County because Mrs. Blackwell's car was stored at his body shop. White testified that he saw between 100-125 primarily Newton County residents a week. He stated that no one he had spoken to had expressed an interest in the case. In White's opinion Gray could receive a fair trial in Newton County.

¶135. J.D. Davis, a resident of Chunky in Newton County, testified he came into contact with approximately 100 primarily Newton County residents a week. He stated that he had heard no one express ill will or indicate they had prejudged the case. He testified that he had not talked to anyone who knew either Gray or Mrs. Blackwell. He also stated that in his opinion Gray could get a fair trial in Newton County. On cross-examination Davis was asked whether the fact that a young black male had been charged with a serious offense against an elderly white would cause public ill will towards the defendant. Davis replied that he did not know, but that it could.

¶136. Wayne Griffith was the mayor of Hickory in Newton County. He stated that on average he would come into contact with approximately 500 primarily Newton County residents every week. Griffith on cross-examination stated he had read about the case in the paper once or twice. He was also aware that Gray had recently escaped from jail. However, Griffith had not heard anyone express an opinion about the Gray case. Griffith was not aware of any general feeling of ill will or prejudice against Gray and believed that Gray could get a fair trial in Newton County.

¶137. James Williamson owned a grocery store and lived at Duffie, which is in the eastern part of Newton County. He stated that he came into contact with about 1000 people a week. He did not know of anyone who had expressed an interest, prejudged, or formed an opinion about Rodney Gray. He testified that he believed Gray could receive a fair trial in Newton County. Williamson stated that persons came into his store a day or two after the murder and commented that she had been killed and run over with a car after being shot. He stated that he did not hear anything about it after that. Williams also stated that he did not believe the facts of the case would inflame the minds of potential jurors.

¶138. Gray alleges that it is apparent from the record that there was extensive news coverage of the crime in Newton County during August of 1994, March and April of 1995, and August of 1995. Gray submitted news articles from The Newton Record and The Union Appeal as exhibits to his motion for change of venue.

¶139. Vance testified there were three separate articles he could recall from The Newton Record. Thomas stated she had read one article in The Union Appeal. White stated that he occasionally read The Union Appeal but did not recall seeing any articles regarding the case. Through White, the defense entered the exhibits attached to the motion for change of venue into evidence. White maintained that "everybody don't [sic] read the Union Appeal and the Newton Record." Davis was asked if the two newspapers were widely read throughout Newton County. He answered that as far as he knew they were, but that he did not know. To all of the defense's questions on cross-examination regarding the influence of the newspaper articles, Davis replied that he did not know and would only speculatively agree with the defense. Griffith stated the papers were circulated throughout the county, but he had only read about the case once or twice. On cross-examination Griffith was asked if the articles would put the case before the public. He responded that it possibly would. Although Williamson did not read the paper, he agreed with the defense that the case has pretty much stayed before the public. Williamson maintained that he had heard no one speak of opinions they might have regarding the case.

¶140. After the hearing the trial judge dictated a lengthy opinion into the record denying the motion. The judge noted the affidavits were deficient in that the affiants were not alleged to be residents of

Newton County. The judge also noted the affiants did not allege to have personal knowledge of the facts of the case, but only alluded to the motion. The judge commented on each of the witnesses for the State and their testimonies. The judge went on to hold:

> Although not alleged within the motion for change of venue, the Defendant was permitted to develop testimony through the testimony of these witnesses, that this was a crime by a Black person upon a White female, and because of such, there could be no fair trial. That question and that argument in itself presumes and excludes Blacks from serving on juries. The inference is only to White jurors. Yet, each and every witness who was asked the question by Mr. Thames, stated that they felt like race would not be an issue and that the Defendant could receive a fair trial.
>
> It was testified to that there was several articles within the Union Appeal and the Newton Record, which are the two local publications having general circulation within Newton County.
>
> This alleged crime occurred August the 15th, 1994, some fifteen months prior to the date hereof. I do not consider the matter as being so saturated with publicity as was the case in the case of State of Mississippi vs. Fisher and also in the case of State of Mississippi vs. Johnson, two Lauderdale County cases that are the beacon cases in Mississippi regarding pre-trial publicity, and I do not feel that the publicity in this case falls within the terminology of the Supreme Court in those two cases.
>
> The Court being of the opinion that the State has met the burden of proof, that there is nothing developed in the record of this case would indicated the Defendant could not receive a fair trial, but to the contrary he could.
>
> Therefore, the obvious conclusion would be that the motion should be, and it is overruled.
>
> That is the order of the Court.

¶141. A motion for a change of venue is not automatically granted in a capital case. There must be a satisfactory showing that a defendant cannot receive a fair and impartial trial in the county where the offense is charged. Miss. Code Ann. § 99-15-35 (1994). The lower court did not find that the evidence presented by the defense made a satisfactory showing when considered with the witnesses presented by the State.

¶142. "A presumption of inability to conduct a fair trial in a venue arises with an application for change of venue, supported by two affidavits affirming the defendant's inability to receive a fair trial." *Holland v. State*, 705 So. 2d 307, 336 (Miss. 1997)(citing **Porter v. State**, 616 So. 2d 899, 905 (Miss. 1993)). The presumption of the Defendant's inability to receive a fair trial can be rebutted by the State by presenting evidence "at the venue hearing coupled with the trial judge's reasoned. . .sense of the community and, particularly in a case such as this [capital murder], an awareness of the uncontrovertible impact of saturation media publicity upon the attitudes of a community." **Fisher v. State**, 481 So. 2d 203, 215 (Miss. 1985).

¶143. "It is well-established in our jurisprudence that 'the granting of a change of venue is a matter so largely in discretion [sic] of the trial court that a judgment of conviction will not be reversed on

appeal on the ground that a change of venue was refused, unless it clearly appears that trial [sic] court abused its discretion.)" *Simon v. State*, 688 So. 2d 791, 804 (Miss. 1997)(quoting *Billiot v. State*, 454 So. 2d 445, 454 (Miss. 1984)). The discretion deferred to by this Court is the trial court's sound discretion, not its unfettered discretion. *Fisher*, 481 So. 2d at 215. The lower court did not abuse its discretion by denying Gray's motion for change of venue.

¶144. Gray did not present any witnesses at the venue hearing. He relied on the affidavits to create the presumption that he could not receive a fair trial. The affidavits must be by credible witnesses with knowledge of the facts of the case. *Johnson v. State*, 476 So. 2d 1195, 1210 (Miss. 1985). The trial judge was correct in finding the affidavits deficient when he noted in his findings that they did not allege the affiants had personal knowledge of the facts as set forth in the motion. The affidavits only alluded to the motion, but not the actual facts. Further, the affiants were not shown to be residents of Newton County.

¶145. The State presented six witnesses and the trial judge had the opportunity to hear their testimony, both direct and under cross-examination. He found the State had rebutted any presumption that had been created by the defense's affidavits alleging prejudice on the part of potential jurors. The judge did not find persuasive Gray's claims that he could not receive a fair trial. The State's witnesses rebutted these claims and showed the community had not prejudged or formed an opinion as to Gray's guilt or innocence.

¶146. The State correctly asserts there is bound to be media coverage of every capital murder case. However, this Court has stated that when the news media have heavily reported a case, the lower courts should be prepared to change venue. *Johnson*, 476 So. 2d at 1215. However, the lower court judge noted that this case was not saturated with publicity as was the case in *Fisher* and *Johnson*. There is little mention of television coverage in the record. The main coverage was in The Newton Record and The Union Appeal, both local weekly newspapers in Newton County. There were eleven newspaper articles from August of 1994 to January of 1996. Neither the victim nor the defendant were residents of Newton County. The testimony of the State's witnesses at the venue hearing indicated that neither the victim nor the defendant were well known in Newton County.

¶147. The Court finds that Gray has not created an irrebuttable presumption of prejudice. Although this was a capital murder case and the Defendant was a black man accused of killing a white woman, there was no intensely prejudicial pretrial publicity so as to create a presumption of prejudice among potential jurors as was the case in *Fisher* and *Johnson*. *Morgan v. State*, 681 So. 2d 82, 92 (Miss. 1996).

¶148. The presumption of the Defendant's inability to receive a fair trial can also be rebutted if the State can prove from voir dire that the trial court impaneled a fair and impartial jury. *Harris v. State*, 537 So. 2d 1325, 1329 (Miss. 1989). "The linchpin is whether the venire members stated that they could be fair and impartial jurors if chosen." *Simon*, 688 So. 2d at 804.

¶149. After initial instructions, qualifications, and voir dire by the court, the State conducted its voir dire of the jury venire. The defense then conducted its voir dire of the jury venire. At the conclusion of "for cause" challenges to the jury venire, Mr. Lee, one of Gray's attorneys, made a motion to quash the jury panel for two reasons.

¶150. The first was an insufficient number of black members of the panel in relation to the percentage of blacks in Newton County. The trial judge overruled the motion as to the first reason stating black and white jurors were excused for reasons given to and accepted by the court. The judge noted that at the time the black jurors were excused for cause shown the defense did not make an objection.

¶151. The second reason Mr. Lee wanted to quash the jury panel was because the summons that went out to the potential jurors had printed on it the charge of capital murder in bold print. Mr. Lee argued that the jurors should have come into court only knowing there was a criminal case to be tried. He claimed the fact that "capital murder" was printed on the summons had prejudiced the jurors. The judge asked for testimony in support of this argument, which Mr. Lee could not provide. The lower court ruled the motion to be speculative and would require the court to speculate without a showing of some proof. Therefore, the lower court overruled the motion to quash the jury panel.

¶152. Gray did not offer any objection to the jury based on the prejudicial effect of any pretrial publicity. The jury venire was expressly asked by the court if they could try the case fairly and impartially. The trial judge asked if any of the members of the venire had read anything about the case in the papers or heard by word of mouth. One who said he had already made up his mind was excused. The other two who indicated they had heard about the case in the news stated they could make a decision based on the evidence and the law. The State asked the venire if they had prejudged the case as to guilt or innocence and received no response. The State then asked if they could judge the case with a clean slate regardless of what they might have read in the paper and give the defendant a fair trial. Mr. Thames, one of Gray's attorneys, asked on voir dire if the venire had any bias against Gray and stated that the silence indicated there was none. Mr. Thames asked if any member of the venire felt "pro or against" Gray because the summons had listed as the charge "capital murder." Mr. Thames stated that he understood from the venire's silence there were no feelings either way. Mr. Thames asked the venire if the fact that the case involved the charge of rape had inflamed any of the members against Gray. There was no response in the record.

¶153. Where the record indicates the impaneled jury members affirmatively stated that they could fairly and impartially serve as jurors the State has rebutted the presumption of prejudice. *Simon*, 688 So. 2d at 804. The record before the Court clearly indicates the panel members were asked repeatedly by the trial judge, the State's attorneys, and Gray's attorneys if they could be fair and impartial. There is nothing in the record to indicate that the jurors were not fair and impartial. Any presumption of prejudice was rebutted by the empaneling of the impartial jury in Gray's case. *Berry v. State*, 575 So. 2d 1, 8 (Miss. 1990).

¶154. The granting of a change of venue is within the sound discretion of the trial judge. The trial judge did not abuse his discretion by denying Gray's motion for a change of venue. The affidavits filed by Gray with his motion for change of venue were insufficient to create a presumption that he could not receive a fair trial in Newton County. If the presumption was created it was not of a type deemed irrebuttable according to the factors enumerated by the Court in *White v. State*, 495 So. 2d 1346, 1349 (Miss. 1986). The fact that Gray is black and was charged with capital murder of Mrs. Blackwell, who was white, is not enough to create an irrebuttable presumption that Gray could not receive a fair trial. The State sufficiently rebutted any presumption against a fair trial at the venue hearing and the subsequent voir dire. This assignment of error is without merit.

## XI. WHETHER THE COURT ERRED BY ALLOWING AN IN-COURT IDENTIFICATION OF THE DEFENDANT BY A WITNESS.

¶155. Gray contends the in-court identification of him by witness Harry Jones was tainted by an allegedly suggestive pre-trial identification of Gray. Gray timely objected at trial arguing the procedures used by the police tainted Jones' identification at the jail and his subsequent in-court identification. A suppression hearing was had outside the presence of the jury.

¶156. Jones identified Gray as one of two persons he saw on the day Mrs. Blackwell was murdered wrestling in a car stopped on Turkey Creek Road in Newton County. He stated that one was a young black man but did not know whether the other person was black or white, male or female. Jones did state that the driver looked straight at him right before he "took off." Jones testified that he had seen the car on the news the day following the murder and remembered it was the same car he had seen on the morning of the murder. He went to the Sheriff's office and explained what he had seen.

¶157. Jones stated he was shown five or six pictures, and he knew two or three of them. Jones was then shown an individual through a peephole in the jail and immediately identified Gray as the person he saw driving Mrs. Blackwell's car. The trial judge then made his ruling allowing Jones to testify.

> BY THE COURT: I fail to see how it can be argued that an impermissible lineup distorted this witness's identification, because according to his testimony, he saw photographs of those, and he knew most of those persons that he saw, then immediately he was shown the Defendant through a peephole, and he made identification.
>
> His identification in the Courtroom here is a positive identification. He testified that it was not assisted by the showing of the photographs or viewing the Defendant through a peephole, but it was based entirely upon his viewing the Defendant at the scene.
>
> The witness stated it was some twenty to thirty feet the Defendant was away from him, and that he looked directly at him.
>
> So your motion to suppress is denied.

¶158. Gray contends on appeal that the procedure by which Jones identified him at the jail was suggestive and flawed, because Jones knew the persons in some of the pictures. Gray asserts that Jones viewing him immediately after the photographic viewing made identification of Gray very likely. Gray also claims that Jones was receptive to suggestion that the persons he had seen in the car were the victim and Gray, because Gray was a young black man and Mrs. Blackwell was an elderly white female.

¶159. This Court's review of suppression hearings on appeal is well settled:

> The standard of review for suppression hearing findings in a matter of pretrial identification cases is whether or not substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted. *Magee v. State*, 542 So. 2d 228, 231 (Miss. 1989); *Nicholson v. State*, 523 So. 2d 68, 71 (Miss. 1988); *Ray v. State*, 503 So. 2d 222, 224 (Miss. 1986). The appellate review should disturb the findings of the lower court "**only where there is an absence of**

**substantial credible evidence supporting it**." [Emphasis added]. *Ray v. State*, 503 So. 2d at 224.

*Ellis v. State*, 667 So. 2d 599, 605 (Miss. 1995) (emphasis in original).

¶160. The State submits there was substantial credible evidence to support the lower court findings. Even if the pretrial identification of Gray was impermissibly suggestive, the in-court identification does not necessarily have to be excluded. Reliability has been deemed the linchpin in determining the admissibility of the identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Nathan v. State*, 552 So. 2d 99, 104 (Miss. 1989). The lower court must determine from the totality of the circumstances if the identification was reliable even though the confrontation procedure may have been suggestive. *York v. State*, 413 So. 2d 1372, 1377-78 (Miss. 1982).

¶161. In determining whether this standard has been met there are certain factors that must be considered.

> 1. Opportunity of the witness to view the accused at the time of the crime;
>
> 2. The degree of attention exhibited by the witness;
>
> 3. The accuracy of the witness' prior description of the criminal;
>
> 4. The level of certainty exhibited by the witness at the confrontation;
>
> 5. The length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *York*, 413 So. 2d at 1383.

¶162. Applying the factors set forth in *Neil* to the present case the following is clear:

> **1. <u>Opportunity to view the accused</u>**--
>
> Jones testified that the car was stopped when he first approached it, but the driver took off. He stated that the driver looked straight at him before driving away. Jones stated that he got a good look at the man, because he was about twenty feet away from Gray when he saw him.
>
> **2. <u>Degree of attention</u>**--
>
> Jones stated the persons in the car attracted his attention because they appeared to be wrestling. Jones said he figured it was a boyfriend and girlfriend fighting.
>
> 3. **<u>Accuracy of prior description</u>**--
>
> Jones described the driver of the car as a young, black man. He stated that he saw the individuals in the car around noon time.
>
> 4. **<u>Witness' level of certainty at confrontation</u>**--
>
> Jones immediately identified the person shown to him through the peephole as the person who he had seen driving Mrs. Blackwell's car. That individual was Rodney Gray. Jones stated that he

based his in-court identification of Gray based on what he saw "out on the road" on the day Mrs. Blackwell was murdered, not what he saw at the jail.

5. **Length of time between the crime and the confrontation**--

Jones stated that he recognized the car when he saw it on the news the day after Mrs. Blackwell was murdered. He contacted the law enforcement officials to report what he had seen. He identified Gray the same day, which was the day after he had seen him driving Mrs. Blackwell's car.

¶163. Gray alleges his case is analogous to *Foster v. California*, 394 U.S. 440 (1969). There the Supreme Court held an in-court identification inadmissible because of the unreasonable suggestiveness of the pre-trial lineup. In *Foster* the witness was shown a line-up of three suspects. Foster was set apart from the other two because he was taller and wore a leather jacket similar to the one worn by the person who had robbed the store where the witness worked. The witness was not sure after the first line-up and asked the police to permit a one-to-one confrontation with Foster. The witness still could not give a positive identification. A week to ten days later the police arranged a second line-up. Foster was the only person in the second line-up who had been in the original line-up. After the second line-up, the witness positively identified Foster as the robber. The Supreme Court held this to be clearly suggestive and to undermine the reliability of the witness identification process. *Foster*, 394 U.S. at 443.

¶164. The case presently before the Court is clearly distinguishable. Jones made a positive identification immediately up on being shown Gray through the peephole. Even if the show-up identification was impermissibly suggestive, the reliability of the in-court identification is evident from the record. Jones' identification met the factors set forth in *Neil*. Jones testified that he identified Gray based on what he saw on the day Mrs. Blackwell was murdered rather than what he saw at the jail.

¶165. The Court holds that the findings of the trial judge at the suppression hearing was supported by substantial credible evidence in the record. Therefore, Gray's assignment of error is without merit.

### XII. WHETHER THE COURT ERRED BY FAILING TO DISMISS THE INDICTMENT BECAUSE THE UNDERLYING FELONIES WERE LISTED IN THE DISJUNCTIVE.

¶166. Gray alleges the indictment charging him with capital murder was substantively defective because the two underlying felonies were listed in the disjunctive and therefore failed to state the essential facts of the offense charged. The indictment reads as follows:

That Rodney Gray late of the County aforesaid, on or about the 15th day of August in the year of our Lord, 1994, in the County and State aforesaid, and within the jurisdiction of this Court, did willfully, unlawfully, feloniously and of his malice aforethought kill and murder Grace Blackwell, a human being, while engaged in the commission of the crime of kidnapping and/or rape, contrary to and in violation of Section 97-3-19-(2)(e), Miss. Code Ann. (1972), as amended, against the peace and dignity of the State of Mississippi.

¶167. "It is a well-established principle of law that in order for an indictment to be sufficient, it must contain the essential elements of the crime charged." *Peterson v. State*, 671 So. 2d 647, 652-53 (Miss. 1996). Gray alleges that the definiteness requirement of an indictment, found in URCCC 7.06, prohibits alternative charges or a charge that an offense was committed in one way or another. To support his position, he cites unto the Court the following cases: *State v. Sam*, 154 Miss. 14, 122 So. 101 (1929); *Black v. State*, 199 Miss. 147, 24 So. 2d 117 (1945); *West v. State*, 169 Miss. 302, 152 So. 888 (1934); *Powell v. State*, 196 Miss. 331, 17 So. 2d 524 (1944). Simply put, Gray alleges that the term "and/or" in this indictment means "while engaged in the crime of kidnapping or rape or both."

¶168. After a thorough review and search of the record, the Court can find no motion to demur or quash the indictment on this ground or any objection to the indictment's form. Gray did object to the indictment on other grounds. Gray filed a motion to quash the indictment on account of discrimination in the selection of grand jury foreperson. The lower court denied this motion. Gray filed a motion to quash the indictment against him for lack of a speedy trial and appointment of counsel. The lower court overruled this motion to quash the indictment. Gray did not allege a defect in the indictment in his motion for a new trial.

¶169. The State argues that this issue is procedurally barred from being raised for the first time on appeal. "A trial judge will not be found in error on a matter not presented to him for decision." *Jones v. State*, 606 So. 2d 1051, 1058 (Miss. 1992) (citing *Crenshaw v. State*, 520 So. 2d 131, 134 (Miss.1988)). Gray did not object at trial and allege the term "and/or" caused a defect in the indictment. Eliminating the word "or" would have cured the alleged error and would have been clearly an amendment of form not substance. Defects on the face of an indictment must be presented by way of demurrer. *Brandau v. State*, 662 So. 2d 1051, 1054 (Miss. 1995); Miss. Code Ann. § 99-7-21 (1994). When "the formal defect is curable by amendment. . .the failure to demur to the indictment in accordance with our statute" will waive the issue from consideration on appeal. *Brandau*, 662 So.2d at 1055.

¶170. Gray filed several motions to quash the indictment for various reasons. None of the motions to quash mentioned a defect in the indictment as to the language in the charge against Gray. The alleged defect was not presented to the lower court for a ruling. This issue is procedurally barred because Gray attempts to raise it for the first time on appeal.

¶171. Alternatively, the issue is without merit. This Court has made it "clear that the ultimate test, when considering the validity of an indictment on appeal, is whether the defendant was prejudiced in the preparation of his defense." *Medina v. State*, 688 So. 2d 727, 730 (Miss. 1996). Gray has failed to demonstrate such prejudice to this Court.

¶172. The indictment must be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation against him. *Peterson v. State*, 671 So. 2d 647, 653-54 (Miss. 1996); URCCC 7.06. The indictment is held to be sufficient if it contains the seven factors enumerated in URCCC 7.06.

    1. The name of the accused;

    2. The date on which the indictment was filed in court;

3. A statement that the prosecution is brought in the name and by the authority of the State of Mississippi;

4. The county and judicial district in which the indictment is brought;

5. The date and, if applicable, the time at which the offense was alleged to have been committed. Failure to state the correct date shall not render the indictment insufficient;

6. The signature of the foreman of the grand jury issuing it; and

7. The words "against the peace and dignity of the state."

*Id.* The indictment in the case presently before the Court met these requirements.

¶173. The indictment contained a charge of capital murder defined in Miss. Code Ann. § 97-3-19 (2) (e). Therefore, the indictment was in compliance with Miss. Code Ann. § 99-17-20, and it is not necessary to specifically set forth the elements of the underlying felony used to elevate the crime to capital murder. ***Mackbee***, 575 So. 2d at 34-35; *See* ***Bullock v. State***, 391 So. 2d 601, 606 (Miss. 1980); ***Bell v. State***, 360 So. 2d 1206, 1208-09 (Miss. 1978). Gray was sufficiently informed of the underlying felonies and the essential facts constituting the offense of capital murder.

¶174. Most recently the Court has spoken to this issue in ***State of Mississippi v. Berryhill***, 703 So. 2d 250 (Miss. 1997). There the defendant was charged with capital murder while engaged in the commission of a burglary. The Court held "that capital murder indictments that are predicated on burglary are required to state the underlying offense to the burglary." *Id.* at 255. This holding was limited to those capital murder indictments predicated on burglary. The Court stated:

Simply put, the level of notice that would reasonably enable a defendant to defend himself against a capital murder charge that is predicated upon burglary must, to be fair, include notice of the crime comprising the burglary. **Burglary is unlike robbery and all other capital murder predicate felonies in that it requires as an essential element the intent to commit another crime.**

*Id.* at 256 (emphasis added). Our holding in ***Mackbee*** and ***Peterson*** still controls as to all other capital murder predicate felonies. A capital murder indictment based on an underlying felony, other than burglary, does not have to specifically set forth the elements of the underlying felony used to elevate the crime to capital murder. ***Berryhill***, 703 So. 2d at 256; ***Peterson***, 671 So. 2d at 653-54; ***Mackbee***, 575 So. 2d at 34-35.

¶175. Gray's argument dealing with the term "and/or" has been dealt with before by the Court in ***Lockett v. State***, 517 So. 2d 1317, 1336 (Miss. 1987). At the sentencing phase of Lockett's trial, an aggravating circumstance was submitted to the jury that stated, "Whether the capital offense was committed while the defendant was engaged in burglary, robbery and/or kidnapping, or in an attempt to commit one or more of such crimes." *Id.* The Court held "[s]ince the evidence at trial was sufficient to support both the underlying felonies of burglary and robbery, it seems that the addition of the crime of kidnapping in the sentencing instruction was surplusage." *Id.*

¶176. The State contends that the evidence presented against Gray was sufficient to prove both

underlying felonies beyond a reasonable doubt. We agree. The State submits that the prosecution took on the burden of proving both underlying felonies. The State also asserts that presumably both underlying felonies were charged just in case the proof in one or the other was insufficient at trial, therefore allowing them to amend the indictment to conform to the proof. The State argues this was unnecessary because there was sufficient evidence at trial of both the kidnapping and the rape charges, as evidenced by the jury unanimously finding both as aggravating circumstances.

¶177. Gray's claims as to this issue are procedurally barred because he attempts to argue a facial defect in the indictment for the first time on appeal. His attempts to do so are contrary to Miss. Code Ann. § 99-7-21 (1994) and the prior holdings of this Court. Alternatively, his claims are without merit. The indictment complied with the requirements of URCCC 7.06 and adequately informed Gray of the underlying felonies used to charge him with capital murder. The evidence presented at trial was sufficient to prove both kidnapping and rape beyond a reasonable doubt. Therefore, this issue is without merit.

### XIII. WHETHER THE COURT ERRED BY ALLOWING THE JAIL-HOUSE CONFESSIONS OF THE DEFENDANT TO HIS FORMER CELL-MATES INTO EVIDENCE.

¶178. Gray asserts that the testimony of his two former cell-mates, Russell Saunders and Cleveland McCall, should not have been admitted. Both testified that Gray had admitted to them that he was guilty of the crime for which he had been charged. Gray alleges that Saunders, a second time offender, was made a trusty shortly after he told Sheriff Cross what he had heard Gray say. Gray claims that McCall was biased against Gray, as well. He states this bias was shown in McCall's testimony when he asked about making bond. In his response to the question, McCall stated Gray had a hacksaw blade.

¶179. Gray then argues that the unreliability of cell-mate testimony of confessions is stuff of legend. Its use has historically produced injustice, and its intrinsic unfairness is a violation of the due process clause of the Fourteenth Amendment to the United States Constitution.

¶180. Gray cites to this Court no authority to support his assertions. He alleges the unreliability of cell-mate testimony is "stuff of legend" and has historically produced injustice, but offers not one case to support his argument. It is the duty of the appellant to provide this Court with authority to support his arguments on appeal. *Hoops*, 681 So. 2d at 526. "This Court has repeatedly held that failure to cite any authority may be treated as a procedural bar, and it is under no obligation to consider the assignment." *Weaver v. State*, No. 95-KA-01034-SCT, 1997 WL 703057, at *4 (Miss. Nov. 13, 1997) (citing *McClain v. State*, 625 So. 2d 774, 781 (Miss. 1993)). Secondly, the issue is procedurally barred because Gray did not object at trial to the testimony of either Saunders or McCall. "(Counsel may not sit idly by making no protest as objectionable evidence is admitted, and then raise the issue for the first time on appeal.)" *Davis*, 684 So. 2d at 658(quoting *Cole v. State*, 525 So. 2d 365, 369 (Miss. 1987)). This issue clearly invokes the procedural bar.

¶181. Alternatively, this claim is without merit. Gray claims the two inmates stood to gain something in exchange for their testimony. This Court has not viewed such testimony favorably. *See McNeal v. State*, 551 So. 2d 151, 158 (Miss. 1989). The evidence in the record before the Court does not establish the inmates received anything in exchange for their statements. True, Saunders was made a

trusty sometime after he told the sheriff what Gray had said, but his testimony indicated that he had served sufficient time to become a trusty. The charges against McCall were dropped after the man who claimed McCall had stolen his car failed to show up in court.

¶182. "(The credibility of a witness, even a convict witness, is for the jury.)" *Carr*, 655 So. 2d at 837 (quoting *Sudduth v. State*, 562 So. 2d 67, 70 (Miss. 1990)). The witness' "criminal record, character, motivation, reliability, and the circumstances surrounding his recitation of statements made. . .were all factors properly left to the jury to weigh." *Id.*

¶183. The State argues that Gray could have submitted an instruction requiring the jury to weigh an informant's testimony with caution and suspicion. Gray submitted Instruction D-24, which attempted to instruct the jury to consider proof of bias, prejudice, or motive or whether or not Saunders and McCall received preferential treatment. This instruction was refused because it was repetitious with Instruction D-18, which instructed the jury they were the sole judges of the credibility of witnesses. This failure to submit an instruction to weigh the credibility with caution and suspicion should serve as a bar to raise this point on appeal. *Carr*, 655 So. 2d at 837.

¶184. Gray was able to cross-examine Saunders and McCall. The jury was aware that both of these individuals were cell-mates of Gray at the time they heard his statements. The defense attorney even called them "snitches." The jury was aware their testimony might be unreliable.

¶185. This issue is procedurally barred and without merit.

### XIV. WHETHER THE DEFENDANT WAS DENIED HIS RIGHT TO COUNSEL.

¶186. Gray claims he was denied the right to counsel after he was taken into custody on August 15, 1994. He states he was first appointed counsel on March 22, 1995. He further alleges that he was denied an initial appearance within 48 hours of his arrest in violation of URCCC 6.03. Lastly, Gray complains the statements made to Saunders and McCall were made during the seventh month period between August of 1994 and March 1995 when he was without counsel. He argues that these statements might not have been made if counsel had been appointed.

¶187. As has been discussed previously in Issue I., Gray was arrested on August 15, 1994, for the burglary of Mrs. Blackwell's home. According to the testimony of Sheriff Cross, Gray was charged with burglary, given an initial appearance, and had an attorney appointed to represent him on that charge. On March 15, 1995, Gray was arrested and formally charged with the capital murder of Mrs. Blackwell. Counsel was appointed to represent Gray regarding the capital murder charge on March 22, 1995.

¶188. Gray's argument clearly misstates the record. He was not arrested on August 15, 1994, for the murder of Mrs. Blackwell. On that day, Gray was arrested for the burglary of her home. He was not charged with the capital murder of Mrs. Blackwell until he was arrested on March 15, 1995. He promptly had counsel appointed for him on March 22, 1995. "Under the Mississippi Constitution, the right to counsel 'attaches once the proceedings reach the accusatory stage,' which is 'earlier in the day than does the federal right.'" *Johnson v. State*, 631 So. 2d 185, 187-88 (Miss. 1994) (citation omitted). "The 'accusatory stage' is defined by Mississippi law to occur when a warrant is issued or, 'by binding over or recognizing the offender to compel his appearance to answer the offense, as well

as by indictment or affidavit.'" ***Ormond v. State***, 599 So. 2d 951, 956 (Miss. 1992) (quoting Miss. Code Ann. § 99-1-7 (Miss. 1972)).

¶189. Clearly, Gray was bound over to answer the charge of capital murder when he was arrested on March 15, 1995. He was appointed counsel seven days later on March 22, 1995. This was not a denial of his right to counsel. Even if Gray had been denied his right to counsel, he must be able to "show some adverse effect or prejudice to his ability to conduct his defense before denial of this right to counsel constitutes reversible error." ***Ormond***, 599 So. 2d at 956 (citing ***Williamson***, 512 So. 2d at 876)).

¶190. Gray has not proven that his defense was prejudiced. Gray alleges that he was prejudiced because during his incarceration a key witness that could have provided crucial information to his defense died in May of 1995. Gray was appointed counsel in March of 1995. Nearly two months passed without any action by Gray or his attorneys to secure the testimony of this witness prior to his death in May of 1995. At trial no evidence was presented as to what this witness' testimony would have been. Gray's argument is speculative, and not evidence of prejudicial action by the State. ***Ewell***, 383 U.S. at 122.

¶191. Gray argues that the statements to Saunders and McCall would not have been made were it not for his lack of counsel. This argument is specious. The statements were made to McCall in either October or November of 1995. This was seven or eight months after counsel was appointed in March of 1995 to represent Gray on the capital murder charge. His argument that he would not have made the statements to McCall had he been represented by counsel is without merit. It is mere speculation to say that he would not have made the statements to Saunders if he had counsel appointed to represent him on the capital murder charge when that same representation did not prevent him from making the statements to McCall.

¶192. Gray also argues that he would not have pled guilty to three felony charges in September of 1995, which made him a convicted felon for cross-examination purposes, if he had counsel appointed for him on the capital murder charge. Again, Gray was appointed counsel to represent him on the murder charge in March of 1995. He cannot claim that because he was denied counsel he pled guilty to these unrelated felonies. The record before this Court clearly indicates that he was in fact represented by counsel on the murder charge when he pled guilty to those unrelated felony crimes.

¶193. This argument is without merit. There was no denial of Gray's right to counsel as to the murder charge. Gray had counsel appointed for him seven days after he was arrested and charged with capital murder. Even if there had been a denial of his right to counsel, Gray has failed to demonstrate to this Court how his defense was prejudiced.

## XV. WHETHER THE EVIDENCE IS SUFFICIENT TO SUPPORT THE SENTENCE.

¶194. Gray claims the evidence was insufficient to support a sentence imposing the death penalty. He asserts the only testimony offered by the State in the sentencing phase of the trial was victim impact testimony. He states the proof offered at the sentencing phase did not address the statutory aggravating circumstances enumerated in Miss. Code Ann. § 99-19-101 (1994). Gray argues that proof of aggravating circumstances in the sentencing phase of a capital murder trial must be proof beyond a reasonable doubt. ***White v. State***, 532 So. 2d 1207, 1220 (Miss. 1988).

¶195. The jury found as an aggravating circumstance that Gray murdered Mrs. Blackwell while engaged in the crimes of kidnapping and rape. Gray claims there was no evidence of kidnapping, much less proof of such crime beyond a reasonable doubt as required by *White*.

¶196. Gray complains that the only testimony of the circumstances of the killing was from Russell Saunders during the guilt phase of the trial. Saunders stated that Gray had told him that the shooting of Mrs. Blackwell was an accident. Gray asserts that because this is an admission of Miss. Code Ann. § 99-19-101 (7) (a) (1994), "the defendant actually killed," the verdict is not invalidated, but the determinations that Gray attempted to kill, intended a killing take place, and contemplated that lethal force would be employed were not proven beyond a reasonable doubt. Because the jury stated they had found these factors to have been proven beyond a reasonable doubt, Gray claims it evidences bias and prejudice on the part of the jury. In light of this argument, he requests that his sentence be reduced to life imprisonment or a resentencing hearing ordered.

¶197. Gray did not object to Sentencing Instruction S-6, which defined the ***Edmund v. Florida***, 458 U.S. 782 (1982), factors and instructed the jury on what aggravating circumstances it could consider. This issue is procedurally barred. Gray's attorney was specifically asked if he had an objection to Sentencing Instruction S-6 and replied "No objection." Where a defendant fails to contemporaneously object to an instruction at trial, he is procedurally barred from raising this issue on appeal. *Lester*, 692 So. 2d at 799; *Ballenger*, 667 So. 2d at 1264; *Brown*, 690 So. 2d at 297.

¶198. Alternatively, this claim is without merit. There was sufficient evidence to support the finding that this crime took place during a kidnapping. After the guilt phase of the trial, the State moved that all the evidence, including witnesses' testimony and all exhibits, from the guilt phase be brought forward and admitted in the sentencing phase. This motion was granted without objection from Gray.

¶199. There was sufficient evidence presented at the guilt phase to prove the aggravating circumstances. Arlene McCree testified that Mrs. Blackwell acted very strangely when she came to the drive-through window at the bank and asked for $1200. McCree stated that Mrs. Blackwell kept trying to move her lips to tell her something. As Mrs. Blackwell left the bank, McCree heard her say, "I'm hurrying. I'm hurrying." Harry Jones testified that he saw Gray wrestling with someone in Mrs. Blackwell's car. Richard Weir stated he saw a black man trying to grab a white female in a car that looked like Mrs. Blackwell's. John Riley testified that Mrs. Blackwell's door had been left open and her telephone wires had been disconnected. Cleveland McCall testified that Gray had told him that he took Mrs. Blackwell to the bank to get some money, he raped her, and he shot her.

¶200. The record indicates that the evidence presented to the jury was sufficient to prove kidnapping beyond a reasonable doubt.

> If there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict. . .is thus placed beyond our authority to disturb.

*Holly v. State*, 671 So. 2d 32, 40 (Miss. 1996) (quoting *McFee*, 511 So. 2d at 133-34).

¶201. Gray misunderstands the requirements of *Edmund*, as incorporated in Miss. Code Ann. § 99-

19-101(7) (1994). The jury need only find one of the enumerated factors in order to return and impose a sentence of death. *Lockett*, 517 So. 2d at 1338; *See* Miss. Code Ann. § 99-19-101 (7) (1994). However, the jury found beyond a reasonable doubt that all four existed.

¶202. In his argument as to this issue, Gray misstates the record and the law. His assignment of error is procedurally barred for failure to object at trial. Alternatively, this issue is without merit. The jury found beyond a reasonable doubt all four of the factors in Miss. Code Ann. § 99-19-101 (7) (1994). There is sufficient evidence in the record to support a verdict imposing a death sentence, and this Court will not disturb such a verdict.

## XVI. WHETHER THE COURT ERRED BY GRANTING S-3 OF THE GUILT PHASE OF THE TRIAL.

¶203. Gray claims that the lower court erred by giving Instruction S-3. He alleges such an instruction prefers a verdict of guilt of capital murder to a verdict of guilt of simple murder. Instruction S-3 provides:

> The Court instructs the Jury that if the State has failed to prove all of the essential elements of the crime of Capital Murder, you may consider the lesser charge of Murder. However, it is your duty to accept the law given to you by the Court; and if the facts and the law warrant a conviction of the crime of Capital Murder, then it is your duty to make such finding uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime.

> If you believe from the evidence in this case beyond a reasonable doubt that at the time and place charged in the indictment and testified about, that the Defendant, Rodney Gray, did willfully, unlawfully, feloniously, and without the authority of law, and of his malice aforethought, kill and murder Grace Blackwell, a human being, but that he, the said Rodney Gray, was not then and there engaged in the commission of the crime of kidnapping or the crime of rape of Grace Blackwell, then it is your duty to find the Defendant guilty of Simple Murder.

¶204. Gray argues that this instruction violates the due process clause of the state and federal constitutions because it has a presumption in favor of capital murder vis-a-vis simple murder. He also asserts the instruction coerces jurors towards convicting the accused of capital murder even though some may believe him to be guilty only of simple murder.

¶205. The State submits that Gray did not object to this instruction being given at trial. The instruction is marked as being given, but the judge skipped it when going over the instructions with the attorneys.

> BY THE COURT: I am going to treat it as a circumstantial evidence case. It is almost entirely, so I am going to treat it that way.

> What do you say to S-1?

> BY MR. LEE: No objection.

BY THE COURT: Given. S-2? Given.

BY MR. LEE: Okay.

BY MR. TURNER: Judge, in light of your ruling, I have S-4 I want to submit. It talks about circumstantial evidence.

BY THE COURT: What do you say to S-4?

BY MR. LEE: No objection.

BY THE COURT: Given. S-5?

¶206. The record indicates that S-3 was missed by both the State and the Defense. However, when Instruction S-3 was read to the jury by the judge, Gray did not object. Because Gray did not enter a contemporaneous objection when the instruction was read to the jury, he should be barred from raising the issue for the first time on appeal. Where a Defendant fails to contemporaneously object to an instruction at trial, he is procedurally barred from raising this issue on appeal. *Lester*, 692 So. 2d at 799; *Ballenger*, 667 So. 2d at 1264; *Brown*, 690 So. 2d at 297.

¶207. In the alternative, Gray's claim as to this issue is without merit. This Court has considered such "acquit-first" instructions before. There is nothing in Mississippi jurisprudence that prohibits such an instruction. *Carr*, 655 So. 2d at 848. Jury "(...instructions should be read in their entirety to determine if there was error)." *Walker*, 671 So. 2d at 608 (quoting *Chase*, 645 So. 2d at 852). Gray's claim that the instruction coerces jurors into convicting of capital murder even though they may believe him guilty only of simple murder is unfounded. This Court has held such a result is not required or warranted from this instruction. *Chase*, 645 So. 2d at 852.

¶208. This assignment of error is procedurally barred for lack of an objection at trial. Alternatively, the issue is without merit because Mississippi law does not prohibit the giving of such an instruction.

### XVII. WHETHER THE COURT ERRED BY GRANTING S-4 ON CIRCUMSTANTIAL EVIDENCE AT THE GUILT PHASE OF THE TRIAL.

¶209. Gray asserts that Instruction S-4 is erroneous because it provides:

The Court instructs the Jury that it is not necessary that facts be proved by direct evidence, but may be proved by circumstantial evidence. Circumstantial evidence is evidence which proves a fact from which an inference of the existence of another fact may be shown. Both circumstantial evidence and direct evidence are equally admissible at trial. Further, the guilt of the defendant may be proved wholly by circumstantial evidence, so long as such guilt is proven beyond a reasonable doubt.

¶210. Gray argues that wholly circumstantial evidence must also prove guilt to the exclusion of every other reasonable hypothesis. *Barrett v. State*, 253 So. 2d 806, 809 (Miss. 1971). He claims because this instruction did not contain the language "to the exclusion of every reasonable hypothesis consistent with innocence," it is erroneous. Thus, he states the verdict must be reversed.

¶211. The State asserts the procedural bar should be applied because Gray did not object to Instruction S-4 when it was submitted. The Court agrees. Where a defendant fails to contemporaneously object to an instruction at trial, he is procedurally barred from raising this issue on appeal. *Lester*, 692 So. 2d at 799; *Ballenger*, 667 So. 2d at 1264; *Brown*, 690 So. 2d at 297.

¶212. Alternatively, the issue is without merit. Although Instruction S-4 did not contain the language "to the exclusion of every other reasonable hypothesis consistent with innocence," other instructions given to the jury did. *See* S-1 (C.P. 260), S-2 (C.P. 261), D-2 (C.P. 269), D-3 (C.P. 270), D-7 (C.P. 274), and D-13 (C.P. 278). "This Court has consistently stated that jury instructions must be considered as a whole." *Walker*, 671 So. 2d at 608 (citing *Roundtree v. State*, 568 So. 2d 1173, 1177 (Miss. 1990)).

¶213. Gray also cited *Parker v. State*, 606 So. 2d 1132 (Miss. 1992), to support his claim that Instruction S-4 was erroneous. *Parker* does not support Gray's claim. The typical circumstantial evidence instruction was more of a peripheral issue in *Parker*. The main issue dealing with circumstantial evidence was the "two theory" instruction. This Court in *Parker* held that a "two-theory" instruction is required in an entirely circumstantial evidence case. *Parker*, 606 So. 2d at 1140-41.

¶214. The State submits that this case was not entirely circumstantial. Gray made statements to two cell mates admitting to the murder of Mrs. Blackwell. Based on these statements, this case is taken out of the circumstantial context. *Taylor*, 672 So. 2d at 1270. *See also Mack v. State*, 481 So. 2d 793, 795 (Miss. 1985). The trial judge granted the circumstantial evidence instructions out of an abundance of caution.

¶215. In addition, the State directs this Court's attention to Instruction D-5, where the lower court granted a "two theory" instruction. Instruction D-5 provides:

> The Court instructs the jury that were there are two plausible theories, sustained by the evidence, one tending to show the Defendant not guilty, and the other tending to show the Defendant guilty, and the jury is unable to determine which theory is true, it must accept the theory favorable to the Defendant, and find the Defendant not guilty.

¶216. This assignment of error is procedurally barred because Gray failed to object at the time the instruction was given. Further, this instruction was unnecessary, but was given out of abundance of caution. When considering the instructions as a whole, the jury was properly instructed as to the proof required when considering circumstantial evidence. Therefore, this issue is without merit.

### XVIII. WHETHER THE EVIDENCE SUPPORTED A KIDNAPPING INSTRUCTION AT GUILT PHASE OF THE TRIAL.

¶217. Gray alleges the trial judge erred in granting Instruction S-5, which described the elements of kidnapping. Gray argues that no evidence of kidnapping was presented to the jury. Therefore, granting the instruction was error requiring reversal of the verdict. Gray cites *Wadford v. State*, 385 So. 2d 951 (Miss. 1980), to support his argument.

¶218. Gray did not offer a pinpoint cite in *Wadford* to indicate which point in the case supported his

proposition. We can only presume Gray wishes to direct the Court's attention to the rule stated in *Pittman v. State*, 297 So. 2d 888, 893 (Miss. 1974), that holds instructions are only to be given where they are applicable to the facts developed in the case. *Wadford*, 385 So. 2d at 954.

¶219. Gray objected at trial to the giving of Instruction S-5 claiming the evidence did not support such an instruction. The trial court overruled the objection and stated in the record its reasoning.

> BY THE COURT: Given. S-5?
>
> BY MR. LEE: I am going to object to that instruction. There is no proof of the kidnapping in evidence.
>
> BY THE COURT: Objection overruled. The testimony of Mrs. McCree, I believe her name is, the teller at the Louin Branch Bank, she testified as to the peculiar circumstances that occurred there. That was in Jasper County, and then through the testimony of the gentleman at La-Z-Boy, whatever his name was, he testified he saw the red vehicle with the Black male and White female struggling, and the testimony of Jones in another area of Newton County, who testified he recognized the Defendant and some unknown person appearing to be struggling.
>
> Then later the evidence being the lady was killed northeast of Decatur, which is approximately eight miles from the site near Turkey Creek.
>
> So, I think that is sufficient evidence to warrant the jury to find the Defendant guilty of the crime of kidnapping. So your objection is overruled, and it is given.

¶220. Before an instruction can be given, it must be supported by the evidence. *Ballenger*, 667 So. 2d at 1255. The trial judge noted on the record that the evidence presented to the jury supported such an instruction. For these reasons and those discussed in Issue XV regarding the sufficiency of the evidence to prove kidnapping, we find this issue is without merit.

### XIX. WHETHER THE VERDICT IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶221. Gray states that his conviction of capital murder required proof that he killed Mrs. Blackwell while engaged in the commission of rape or kidnapping. He argues that no evidence of kidnapping was presented to the jury and the evidence of rape is circumstantial except for the testimony of Cleveland McCall, who stated Gray admitted raping Mrs. Blackwell. Gray also contends the evidence did not exclude the possibility of consensual sexual intercourse. Lastly, he argues that no evidence of penetration was presented to the jury. Therefore, he claims he was not proved to be guilty of capital murder.

¶222. All of these claims and allegations have been previously discussed in this opinion in Issues VIII., XV., and XVIII. The record clearly supports a finding of guilt and sentence of death. This Court has stated [w]hen reviewing a challenge to the weight of the evidence, this Court must determine whether the trial judge abused his discretion. . . ."*Taylor*, 672 So.2d at 1256. "This Court, accepting as true all evidence favorable to the State, will determine whether 'the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice.'" *Id.* (quoting *Wetz v. State*, 503 So. 2d 803, 812-13 (Miss. 1987)).

¶223. Based on the evidence in the record presented before the Court, we hold that the jury verdict was not against the overwhelming weight of the evidence. This issue is without merit.

## PROPORTIONALITY REVIEW

¶224. This Court must finally decide if the death sentence in this case "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Miss. Code Ann. § 99-19-105(3)(c) (1994). If the sentence is disproportionate, this Court may "[s]et the sentence aside and remand the case for modification of the sentence to imprisonment for life." Miss. Code Ann. § 99-19-103(5)(b) (1994). A comparison is made with other cases in which the death penalty was imposed and heard on appeal by this Court, considering the crime and the defendant. *Cabello v. State*, 471 So.2d 332, 350 (Miss. 1985).

¶225. Having given individualized consideration to the both the crime and defendant in the case sub judice, this Court can find nothing that would make the death penalty excessive or disproportionate. The record reflects that Gray: (1) abducted the victim from her home; (2) forced her to withdraw money from her bank account; (3) raped her; (4) shot her in the face with a shotgun; (5) ran over her with her own car; and (6) eventually murdered her. Considering these facts in comparison to other cases, there is nothing that would justify treating this defendant *Holland v. State*, 705 So. 2d 307 (Miss. 1997) (death sentence was proportionate where the defendant asphyxiated the victim by stuffing panties down her throat and tying a shirt around her neck, inflicted stab wounds to her chest, dealt a crushing blow to her head, and sexually assaulted her); *Brown v. State*, 682 So.2d 340 (Miss. 1996), cert. denied, 117 S.Ct. 1271 (1997) (death sentence affirmed where the defendant shot a store clerk four (4) times - once in the head, once through the heart, and twice in the back - during the commission of an armed robbery).

## CONCLUSION

¶226. All of the issues before this Court are either procedurally barred or are without merit. Rodney Gray raises no issue meriting reversal. The record supports his conviction of capital murder and the sentence requiring the imposition of the death penalty. Further, upon review of the totality of this case, we can say that the death penalty is not disproportionate as applied

to Gray. Therefore, this Court affirms the lower court's decision finding Rodney Gray guilty of capital murder and imposing the death penalty.

¶227. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7) (1972) AND M.R.A.P. 41(a).**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, SMITH, MILLS AND WALLER, JJ., CONCUR.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi,*** 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State***, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990) vacating and remanding ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987)***, Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court,case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).


## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

### (continued)


*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).


## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).


## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## ON SENTENCING PHASE ONLY

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

**\*Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi**, 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

\***Pinkney v. State**, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi,** 494 U.S. 1075 (1990) vacating and remanding, **Pinkney v. State,** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

**\*Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

**\*Jones v. State**, 517 So. 2d 1295 (Miss. 1987), **Jones v. Mississippi,** 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (Miss. 1996)


**DEATH CASES REVERSED AS TO**

**PUNISHMENT AND REMANDED FOR A NEW TRIAL**

**ON SENTENCING PHASE ONLY**

**(continued)**

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied* *Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. The transcript testimony of McCall does not refer to a year. The testimony of McCall taken together with that of Sheriffs Cross and Hannah indicate the year to be 1995. Cross testified that Gray was transferred to Newton County in March of 1995, where he remained until trial.

2. Exhibits 3, 4, 5, 30, 31, 32, 33, and 34.